JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS STEVEN H. ANDERSON, JACK S. FLUG, and JEFFREY LATTMANN | DEFENDANTS MARSH & McLENNAN COMPANIES, INC., MARSH USA, INC., and DOES 1 through 50, inclusive |
|---|---|

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Fensterstock & Partners LLP  (212) 785-4100 30 Wall Street, 9th Fl., New York, New York 10005 | ATTORNEYS (IF KNOWN) Winston & Strawn LLP  (212) 294-6700 200 Park Avenue, New York, New York 10166 |
|---|---|

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

29 U.S.C. 1101, et seq. - Breach of Contract after employment termination for Defendants' failure pay Plaintiffs earned special retention awards, annual bonuses, severance pay and earned option awards.

Has this or a similar case been previously filed in SDNY at any time? No☐ Yes? ☒  Judge Previously Assigned Deborah A. Batts

If yes, was this case Vol☐ Invol. ☒ Dismissed. No☒ Yes ☐  If yes, give date 3/7/08 _____ & Case No. 08 CV 2378

*(PLACE AN [x] IN ONE BOX ONLY)*     NATURE OF SUIT

ACTIONS UNDER STATUTES

**TORTS**

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[x] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 MIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/COMMODITIES/EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**ACTIONS UNDER STATUTES**

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 3,499,000   OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____  DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: ☒ YES ☐ NO      NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

*(PLACE AN  x  IN ONE BOX ONLY)*                                ORIGIN

☐ 1 Original        ☒ 2a. Removed from  ☐ 3 Remanded from  ☐ 4 Reinstated or      ☐ 5 Transferred from  ☐ 6 Multidistrict        ☐ 7 Appeal to District
  Proceeding            State Court          Appellate Court         Reopened            (Specify District)        Litigation            Judge from
                    ☐ 2b. Removed from State Court                                                                                     Magistrate Judge
                         AND at least one party is a pro se litigant                                                                   Judgment

*(PLACE AN  x  IN ONE BOX ONLY)*            BASIS OF JURISDICTION              *IF DIVERSITY, INDICATE*
☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 FEDERAL QUESTION   ☐ 4 DIVERSITY   *CITIZENSHIP BELOW.*
                                            (U.S. NOT A PARTY)                    *(28 USC 1332, 1441)*

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED _and_ PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED _or_ PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Steven H. Anderson                      Jeffrey R. Lattmann
4 Appaloosa Drive                       166 Woodbine Circle
Manalapan, New Jersey 07726             New Providence, New Jersey 07974

Jack S. Flug
6 Eton Street
Melville, New York 11747

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas, New York, New York 10036

Marsh USA Inc.
1166 Avenue of the Americas, New York, New York 10036

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☒ FOLEY SQUARE
              (DO NOT check either box if this a PRISONER PETITION.)

DATE           SIGNATURE OF ATTORNEY OF RECORD                 ADMITTED TO PRACTICE IN THIS DISTRICT
3/28/08        *Jannenn Valentine*                             [ ] NO
RECEIPT #                                                      [x] YES (DATE ADMITTED Mo. April  Yr. 2003 )
                                                              Attorney Bar Code # JMV 3144

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
|---|---|---|

STEVEN H. ANDERSON, JACK S. FLUG, and
JEFFREY LATTMANN,

V.

MARSH & McLENNAN COMPANIES, INC., et al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:   08 Civ. 2378 (DAB)(KNF)

TO: (Name and address of Defendant)

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas, New York, New York 10036

Marsh USA Inc.
1166 Avenue of the Americas, New York, New York 10036

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Fensterstock & Partners LLP
30 Wall Street, 9th Floor
New York, New York 10005

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

_____
CLERK

_____
DATE

_____
(By) DEPUTY CLERK

✎AO 440  (Rev.  8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

　　Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

　　　　I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____       _____
　　　　　　　　　　　Date　　　　　　　　　*Signature of Server*


　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
STEVEN H. ANDERSON, JACK S. FLUG, and
JEFFREY R. LATTMANN,

                             Plaintiffs,

               – against –

MARSH & MCLENNAN COMPANIES, INC.,
MARSH USA INC., and DOES 1 through 50, inclusive,

                         Defendants.
-------------------------------------------------------------------x

08 CV 2378 (DAB) (KNF)

**AMENDED COMPLAINT**

Jury Demanded

       1.     Plaintiffs Steven H. Anderson, Jack S. Flug and Jeffrey R. Lattmann, by their attorneys Fensterstock & Partners LLP as and for their Complaint, allege as follows:

### INTRODUCTION

       2.     This is an action by three former long-term employees of the Marsh & McLennan Companies to recover in excess of $3 million for Defendants' breach of contract consequent to Defendants' failure to pay Plaintiffs their earned special retention awards, annual bonuses, severance pay and for their earned option awards.

### PARTIES

       3.     Plaintiff Steven H. Anderson is a resident of Manalapan, New Jersey.

       4.     Plaintiff Jack S. Flug is a resident of Long Island, New York.

       5.     Plaintiff Jeffrey R. Lattmann is a resident of New Providence, New Jersey.

       6.     Upon information and belief, Defendant Marsh & McLennan Companies, Inc. ("MMC"), is a global professional services firm which provides advice and solutions in risk,

strategy, and human capital in more than 100 countries, is a Delaware corporation, and maintains its principal place of business at 1166 Avenue of the Americas, New York, New York, 10036.

7.    Upon information and belief, Defendant Marsh USA Inc. ("Marsh"), a Delaware corporation, is a risk and insurance services subsidiary of MMC with 26,000 employees, annual revenues approaching $5 billion, and provides global risk management, risk consulting, insurance brokering, alternative risk financing, and insurance program management services for businesses, public entities, associates, professional services organizations, and private clients. Marsh maintains its principle place of business at 1166 Avenue of the Americas, New York, New York, 10036.

8.    The true names and capacities of Defendants named herein as Does 1 through 50 are unknown to Plaintiffs, who, therefore, sue these Defendants by such fictitious names. Plaintiffs will amend the complaint to show the true names and capacities of such Does when they have been ascertained. Upon information and belief, Does 1 through 50 were responsible in some manner for the acts and transactions hereinafter alleged and, therefore, are liable to Plaintiffs.

**JURISDICTION AND VENUE**

9.    This action was commenced in Supreme Court of the State of New York, County of New York pursuant to CPLR §§ 301, 302 and 503 because Defendants are based in New York and/or transact substantial business in New York, and/or because each Defendant has transacted business in New York in connection with the other Defendants and/or the acts described herein, and because Defendants have their principal offices in this county and the causes of action herein arose in this county. This action was subsequently removed to this Court by Defendants

2

Marsh & McLennan Companies, Inc. and Marsh USA, Inc. (collectively, "Defendants") pursuant to 28 U.S.C. §§ 1331, 1367(a), and 1441 pursuant to 29 U.S.C. § 1101 et seq., and 29 U.S.C. § 1132(a) and § 1144(a).

## STATEMENT OF FACTS

10.     Plaintiff Mr. Anderson was employed in various capacities by Marsh from August 1989 through December 30, 2004, his most recent title being Chairman of all of U.S. FINPRO Client Advisory.  FINPRO was an operating unit of MMC with about 540 employees in 2004.

11.     Within Marsh, FINPRO earned large profits for the Company.  FINPRO was highly successful and had an entrepreneurial culture.

12.     Plaintiff Mr. Flug was employed in various capacities by Marsh from March 1995 through December 30, 2004, his most recent title being Managing Director and Vice Chairman of FINPRO.

13.     Plaintiff Mr. Lattmann was employed in various capacities by Marsh from 1990 through December 30, 2004, his most recent title being Managing Director and Head of all U.S. FINPRO Placement.

14.     In or around the spring of 2002, Mr. Anderson received an offer of employment from AON, Marsh's biggest competitor.  Senior employees at Marsh became aware of the details of this offer.  Mr. George Mikes, who was, at that time, the chairman of the Global Risk Management Practice at Marsh, induced Mr. Anderson to stay at Marsh by offering him additional compensation and restricted stock options.  The compensation that Mr. Mikes and Marsh offered to

Mr. Anderson to stay at Marsh was a mere fraction of the compensation that was offered to Mr. Anderson by AON but, out of loyalty to Marsh, Mr. Anderson stayed on at Marsh. Mr. Anderson accepted Mr. Mikes' offer in consideration of his continued employment at Marsh. As a direct result of Mr. Mikes' offer, Mr. Anderson was induced, encouraged and convinced to continue his employment at Marsh.

15.    In or around 2002, Mr. Flug was also contacted by Marsh's competitor, AON. Mr. Flug was also induced to stay at Marsh by the offer of additional compensation and restricted stock options. Mr. Flug did not take advantage of or further pursue AON's interest in him, instead he stayed on at Marsh. Mr. Flug accepted Marsh's offer in consideration of his continued employment at Marsh. As a direct result of this offer, Mr. Flug was induced, encouraged and convinced to continue his employment at Marsh.

16.    On or around October 14, 2004, then-New York Attorney General Eliot Spitzer commenced a lawsuit on behalf of the State of New York entitled *Spitzer v. Marsh & McLennan Companies, Inc. et al.*, Index No. 403342/2004, alleging certain wrongful acts, including fraudulent business practices, antitrust violations, and fraud.

17.    As a result of the *Spitzer v. Marsh & McLennan Companies, Inc. et al.* lawsuit, MMC's stock decreased in value and Marsh, which was the MMC subsidiary in which Plaintiffs were employed, became embroiled in panic.

18.    On November 18, 2004, to induce him to stay at Marsh, Mr. Anderson was offered and accepted a Special Retention Award from MMC in the amount of $300,000, a copy of which is annexed hereto as Exhibit A, and wholly incorporated herewith. Based on the promise that

4

he would be employed through the vesting of the Retention Award (unless terminated for cause), Mr. Anderson agreed to stay at Marsh. According to the Terms and Conditions of this award, it was "to be paid in cash and/or readily tradable MMC Stock, as determined by the Company at the time of payment." The award was to be paid quarterly, over one year, on or around the following dates:

- March 31, 2005          10% of total award
- June 30, 2005           15% of total award
- September 30, 2005      25% of total award
- December 31, 2005       50% of total award

> To be eligible to receive each award payment, you must be actively employed by the Company on the last day of the quarter preceding the payment date, and not serving notice of your resignation at the time. Example: to receive the March 31, 2005 award you must be actively employed on December 31, 2004 and not have submitted notice of resignation on or before December 31, 2004.

The Terms and Conditions go on to state,

> [i]f you are terminated involuntarily, not for Cause, you will be eligible to receive the payment for the full quarter in which you are terminated, but will not receive future payments. If you are terminated for Cause, you will forfeit all future payments and be required to repay all prior retention award payments, including the value, determined at the time of payment, of any shares received. For the purpose of this retention award, a termination "for Cause" is defined as misconduct, including any act or behavior that violates the Company's policies or standards of conduct, or may subject the individual or the Company to civil or criminal liability.

19.    On November 18, 2004, to induce him to stay at Marsh, Mr. Flug was offered and accepted a Special Retention Award from MMC in the amount of $300,000. Based on the promise that he would be employed through the vesting of the Retention Award (unless terminated

5

for cause), Mr. Flug agreed to stay at Marsh. The Terms and Conditions of Mr. Flug's Award are identical to those of Mr. Anderson's as stated above in Paragraph 19.

20.    On November 18, 2004, to induce him to stay at Marsh, Mr. Lattmann was offered and accepted a Special Retention Award from MMC in the amount of $104,000, a copy of which is annexed hereto as Exhibit A, and wholly incorporated herewith. Based on the promise that he would be employed through the vesting of the Retention Award (unless terminated for cause), Mr. Lattmann agreed to stay at Marsh. The Terms and Conditions of Mr. Lattmann's Award are identical to those of Mr. Anderson's as stated above in Paragraph 19.

21.    In early December 2004, during a regular quarterly FINPRO executive committee meeting, Mr. Anderson asked the members of the committee to tell him by the end of the year if they were staying with the company or leaving.

22.    In mid-December 2004, Mr. Anderson had a conversation with George Mikes, who was, at that time, the chairman of the Global Risk Management Practice at Marsh. During this conversation, Mr. Anderson, a loyal employee, inquired in good faith about his options for taking on increased and different responsibilities in the future within Marsh for the purpose of aiding the ailing company. Mr. Mikes stated to Mr. Anderson, "I don't think this is going to happen for you."

23.    In mid-December 2004 during an annual company meeting, Mr. Anderson expressed his concerns that the company was in trauma, and that he believed those in elevated positions, such as himself, needed to take active steps to repair the ailing business. He stated that he felt he could help the firm in various ways and that he would seek the opportunity to do so. He

stated that the most useful positions for him may not necessarily be exclusively within FINPRO, but it was his intention to help the company.

24.    It was in all of Marsh employees' best interests to help rescue MMC and Marsh from turmoil, in part, because many employees, including Plaintiffs, are stockholders of Marsh.

25.    Between October 14 and December 30, 2004, senior employees at Marsh regularly asked Plaintiffs if they were looking for other employment. While Plaintiffs admitted that they were exploring possibilities both within and outside of Marsh, Plaintiffs continued to seek opportunities to assist Marsh during this time of uncertainty and continued to carry out their duties in good faith.

26.    During this same period, most Marsh employees were considering other employment options due to the uncertainty of the outcome of the Spitzer lawsuit. In fact, between mid-October 2004 and the end of December 2004, Tom Zacharopoulos and Henry Whiting who were, at that time, senior employees of Marsh, actively sought employment opportunities outside of Marsh and MMC and actively recruited Plaintiffs to leave Marsh; however, no retaliatory action was taken against Messrs. Zacharopoulos or Whiting.

27.    In or around late December 2004, Dean Klisura, Managing Director and Chairman of FINPRO Placement, approached Mr. Lattmann and stated that he was aware that certain insurance brokers were interested in hiring Mr. Lattmann away from Marsh. Mr. Klisura induced and encouraged Mr. Lattmann to stay at Marsh and offered Mr. Lattmann additional compensation and stock options to stay at Marsh. Mr. Lattmann made no response at that point in time.

7

28.     On or around Monday, December 20, 2004, of Christmas week, George Mikes informed Mr. Flug that he would be replacing Mr. Anderson with Dean Klisura as Chairman of all of U.S. FINPRO Client Advisory.  Mr. Mikes stated to Mr. Flug that they "needed to continue this dialogue."

29.     Mr. Flug informed George Mikes that he would be out of the office on vacation until December 30, 2004.  Upon his return to the office on December 30, 2004, Mr. Flug received multiple voice messages from Mr. Mikes demanding a return call by the close of business of the previous day, December 29, 2004.  At no time before Mr. Mikes' arbitrary December 29 deadline, received by Mr. Flug on December 30, did Mr. Mikes attempt to reach Mr. Flug by mobile telephone or e-mail.  Mr. Flug's mobile telephone number and e-mail address were available on a directory of Managing Directors' contact information which was available to all Managing Directors at Marsh.

30.     On December 30, 2004, Mr. Mikes called Mr. Flug's mobile telephone with Pamela Harrison who was, at that time, Senior Vice President of Marsh's Human Resources Department also on the line.  Knowing that Mr. Flug had been out of the office on vacation, not due to return until December 30, Mr. Mikes irrationally accused Mr. Flug of intentionally ignoring his messages asking for a return call by December 29, 2004.  Mr. Mikes informed Mr. Flug that he was terminated effective immediately, but no explanation was provided to Mr. Flug at that time.  Mr. Mikes then disconnected from the call and left Mr. Flug to speak with Ms. Harrison.

31.    On December 30, 2004, Mr. Mikes left a voice mail message for Mr. Anderson informing Mr. Anderson that he was terminated, although no explanation was provided to Mr. Anderson either at that time.

32.    On December 30, 2004, Mr. Mikes left a voice mail message for Mr. Lattmann informing Mr. Lattmann that he was terminated, again, with no explanation.

33.    On December 30, 2004 after being informed by Mr. Mikes that they were being terminated, Plaintiffs each met individually with Pamela Harrison of Marsh's Human Resources Department. Ms. Harrison informed Plaintiffs that they were fired "for cause." When asked what this alleged "cause" consisted of, Ms. Harrison stated only that Plaintiffs were terminated for "lack of confidence." Ms. Harrison informed Plaintiffs that because Marsh chose to characterize their terminations as "for cause," they would not be receiving severance pay, or any of their retention bonuses, earned bonuses, vested options, or unvested shares and options.

34.    On or around December 31, 2004, Plaintiffs each received a letter from Marsh via United States mail that was dated December 30, 2004. These letters merely stated that Plaintiffs' employment was terminated as of December 30, 2004. No further explanation was offered.

35.    On December 30, 2004 after being informed by Mr. Mikes that they were being terminated, Plaintiffs each met individually with Pamela Harrison of Marsh's Human Resources Department. In each of their respective meetings with Ms. Harrison, Plaintiffs requested any information regarding severance or any other benefits which might pertain to them. This request was again made to Ms. Harrison by Plaintiff Jack Flug on an occasion subsequent to this meeting. In response to these requests, Plaintiffs were not provided with any information regarding severance

9

or any other benefits including any severance pay plans that may apply to Plaintiffs. Plaintiffs were never paid their severance pay that was due and owing.

36.    For Plaintiffs to further pursue any administrative remedies under any applicable severance pay plan would have clearly and positively been futile. Plaintiffs made an unambiguous application for benefits in their December 30, 2004 meetings with Ms. Harrison. Ms. Harrison's failure to provide Plaintiffs with any severance pay plan information, and failure to pay the severance pay that was due and owing, showed a formal or informal administrative decision on the part of Marsh and MMC to deny benefits to Plaintiffs.

37.    When Plaintiffs made their unambiguous application for benefits in their December 30, 2004 meetings with Ms. Harrison, they thereby notified the severance pay plan administrator of a disputed claim.

38.    Plaintiffs were not provided with the opportunity to pursue any further administrative remedies available to them since defendants refused to provide Plaintiffs with any severance pay plan which may have clearly outlined any administrative remedies under said plan, and terminated Plaintiffs as of the date of their notifications, essentially "walking them to the door."

39.    In fact, the termination of Messrs. Anderson, Flug and Lattmann was not "for cause." Marsh had no reasonable basis for Plaintiffs' termination and instead created the feigned explanation that Plaintiffs were fired for evaluating alternative employment options during the uncertain months of the Spitzer investigation. In fact, the events surrounding Plaintiffs' termination were part of a ruse contrived to deprive Plaintiffs of their vested options, unvested shares and options, retention and earned bonuses as well as standard severance pay. The actions taken against

10

Plaintiffs were discriminatory and arbitrary; Messrs. Zacharopoulos and Whiting were not terminated by MMC or Marsh notwithstanding that they actively sought other employment and recruited and solicited Marsh employees to leave MMC and/or Marsh.

40.    Unlike Messrs. Zacharopoulos and Whiting who kept their jobs, Plaintiffs did not recruit or solicit clients or other employees to leave MMC or Marsh while employed by Marsh.

41.    Marsh used this allegation of "lack of confidence" and "cause" as a pretext to deny Plaintiffs' severance pay, their retention bonuses, earned bonuses, vested options, and unvested shares and options, upon their termination.

42.    At the outset of Plaintiffs' employment, Marsh and Plaintiffs agreed that Plaintiffs would be paid an annual bonus, which was an integral part of Plaintiffs' comprehensive total compensation package. Plaintiffs' annual bonuses at Marsh were based on factors such as tenure, amounts received the year prior, and performance, in accordance with the agreement. These bonuses were ordinarily paid in February or March of the following year for the work performed during the prior year. Plaintiffs' bonuses were not discretionary.

43.    Typically, while employed by Marsh, Plaintiffs would receive an annual salary increase in or around April.

44.    Upon their termination from Marsh, Plaintiffs did not receive their Special Retention Awards, their annual bonuses for the 2004 year of service which they had completed, their vested options, severance pay, or unvested shares or options.

45.    Plaintiffs pursued available administrative remedies prior to filing suit when Plaintiffs requested any information regarding severance or any other benefits which might pertain

11

to them during their December 30, 2004 meetings with Ms. Harrison. Pursuant to the Marsh USA Inc. Severance Pay Plan, if an employee requests a copy of plan documents and does not receive them within thirty (30) days, the employee may file suit in a Federal court.

46.    Plaintiffs are entitled to benefits under this plan; however, Defendants did not notify Plaintiffs and provide Plaintiffs with any applicable forms required in connection with receipt of Plan benefits pursuant to the Marsh USA Inc. Severance Pay Plan. Thus, it would have been clearly and positively futile for Plaintiffs to pursue any additional administrative remedies.

47.    Mr. Anderson is entitled to his Retention Bonus of $300,000; his 2004 earned bonus of $350,000; severance of $400,000; 48,300 vested but cut-off options valued at $241,500; and the value of 17,399 unvested shares and 33,070 unvested options.

48.    Mr. Flug is entitled to his Retention Bonus of $300,000; his 2004 earned bonus of $270,000; severance of $325,000; 35,800 vested but cut-off options valued at $179,000; and the value of 10,276 unvested shares and 31,170 unvested options.

49.    Mr. Lattmann is entitled to his Retention Bonus of $104,000; his 2004 earned bonus of $250,000; severance of $200,000; 4,450 vested but cut-off options valued at $22,250; and the value of 3,408 unvested shares and 5,840 unvested options.

### FIRST CLAIM
### (Breach of Contract - Special Retention Awards)

50.    Plaintiffs repeat, reallege, and incorporate each and every allegation in Paragraphs 1 through 49, with the same force and effect as if fully set forth herein.

51.    On November 18, 2004, Plaintiffs were offered and accepted Special Retention Awards from MMC in consideration for Plaintiffs' agreeing to continued employment at

Marsh and with the promise that their employment would continue (unless terminated for cause) through the vesting period. Copies of the Special Retention Awards are annexed hereto as Exhibit A, and wholly incorporated herewith. Upon their arbitrary and wrongful termination, under the guise of fabricated cause, Plaintiffs did not receive their Special Retention Awards although Plaintiffs did not engage in any misconduct, including any act or behavior that violates the Company's policies or standards of conduct, or that which may subject the individual or the Company to civil or criminal liability. Mr. Anderson was denied his Retention Bonus of $300,000; Mr. Flug was denied his Retention Bonus of $300,000; and Mr. Lattmann was denied his Retention Bonus of $104,000.

52.     In reliance on their contracts with Defendants and in reliance on the broken promises made by Defendants to Plaintiffs, Plaintiffs forewent other, more lucrative, employment opportunities in order to stay at Marsh and help re-build the company during its time of turmoil and uncertainty.

53.     As a direct and proximate result of the breach of contract by Defendants as set forth herein, Plaintiffs have been damaged in an amount to be proved at trial but believed to be at least $704,000.

## SECOND CLAIM
### (Breach of Contract - Annual Bonus Awards)

54.     Plaintiffs repeat, reallege and incorporate each and every allegation in Paragraphs 1 through 53 with the same force and effect as if fully set forth herein.

55.     It is regular practice for Marsh to pay annual non-discretionary, performance-based bonuses to employees. The Agreement between Marsh and Plaintiffs that Plaintiffs would be paid an annual bonus was agreed to at the outset of Plaintiffs' employment with Marsh and was an

13

integral part of Plaintiffs' comprehensive compensation package.  In consideration for Marsh's agreement to pay Plaintiffs an annual performance-based bonus, Plaintiffs completed the 2004 year of service to Marsh in good faith but were denied the bonus portion of their earned compensation. Marsh breached the Agreement in that Mr. Anderson was denied his 2004 earned bonus of $350,000; Mr. Flug was denied his 2004 earned bonus of $270,000; and Mr. Lattmann was denied his 2004 earned bonus of $250,000.

56.    As a direct and proximate result of the breach of contract by Defendants as set forth herein, Plaintiffs have been damaged in an amount to be proved at trial but believed to be at least $870,000.

## THIRD CLAIM
### (Breach of Contract - Severance Pay)

57.    Plaintiffs repeat, reallege and incorporate each and every allegation in Paragraphs 1 through 56 with the same force and effect as if fully set forth herein.

58.    The Marsh Inc. Employee Handbook, dated May 2002, at page 12, unequivocally guarantees that "Managing Directors eligible for Enhanced Severance Pay will receive one (1) year's Base Salary."  A copy is annexed hereto as Exhibit B, and wholly incorporated herewith.  According to that same Agreement, "a Plan Participant who executes and returns a Waiver and Release Agreement in the form and within the time required by the Company. . . which may include, without limitation, non-solicitation provisions, will be eligible to receive Enhanced Severance Benefits."

59.    Notwithstanding that Plaintiffs were eligible to receive Enhanced Severance Benefits, Plaintiffs were not given the opportunity to execute the Waiver and Release Agreement,

14

yet refrained from solicitation of Marsh and/or MMC clients and employees in accordance with the Agreement. Each Plaintiff was eligible for Enhanced Severance Pay, yet each was denied severance pay in violation of the Agreement.

60.    It is Marsh's regular practice to make severance payments to departing Managing Directors. Plaintiffs relied on this practice in accepting and continuing employment with Marsh, and in refraining from solicitation of Marsh clients and employees. Marsh breached this Agreement in bad faith in that Mr. Anderson was denied severance pay of $400,000; Mr. Flug was denied severance pay of $325,000; and Mr. Lattmann was denied severance pay of $200,000.

61.    As a direct and proximate result of the breach of contract by Defendants are set forth herein, Plaintiffs have been damaged in an amount to be proved at trial but believed to be at least $925,000.

## FOURTH CLAIM
### (Breach of Contract - Vested and Unvested Options)

62.    Plaintiffs repeat, reallege, and incorporate each and every allegation in Paragraphs 1 through 61 with the same force and effect as if fully set forth herein.

63.    Pursuant to the Marsh & McLennan Companies 2000 Employee Incentive and Stock Award Plan, Plaintiffs are entitled to the value of their vested and unvested options. A copy of the Stock Awards and Plan is annexed hereto as Exhibit C, and wholly incorporated herewith.

64.    Mr. Anderson is entitled to the value of 17,399 unvested shares and 33,070 unvested options; Mr. Flug is entitled to 35,800 vested but cut-off options valued at $179,000, and the value of 10,276 unvested shares and 31,170 unvested options; and Mr. Lattmann is entitled to

15

4,450 vested but cut-off options valued at $22,250; and the value of 3,408 unvested shares and 5,840 unvested options.

       65.    As a direct and proximate result of the foregoing, Plaintiffs have been injured in an amount to be proved at trial but believed to be at least One Million Dollars ($1,000,000).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment awarding Plaintiffs:

A.    On the First Claim (Breach of Contract - Special Retention Awards), damages in an amount to be proved, but believed to be at least $704,000;

B.    On the Second Claim (Breach of Contract - Annual Bonus Awards), damages in an amount to be proved, but believed to be at least $870,000;

C.    On the Third Claim (Breach of Contract - Severance Pay), damages in an amount to be proved, but believed to be at least $925,000;

D.    On the Fourth Claim (Breach of Contract - Vested and Unvested Options), damages in an amount to be proved, but believed to be at least $1 million;

E.    Costs, expenses, and reasonable attorneys' fees to the fullest extent authorized by law; and

F.      Such other and further relief which the Court deems necessary and proper.

Dated: New York, New York
       March 28, 2008

                                FENSTERSTOCK & PARTNERS LLP

                        By:     _____
                                Blair C. Fensterstock (BF2020)
                                Jeanne M. Valentine (JV3144)
                                Allison M. Charles

                                30 Wall Street, 9th Floor
                                New York, New York 10005
                                Telephone:  (212) 785-4100

                                *Attorneys for Plaintiffs*

# EXHIBIT A



**Michael G. Cherkasky**

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036
212 345 3550 Fax 212 345 3570
Michael.Cherkasky@MMC.com
www.mmc.com

November 18, 2004

Steven Anderson
New York, NY

Dear Steve,

I want to thank you for all the work you have done to date to help rebuild our organization. There is still much to be accomplished and we look forward to you being part of the team that will help Marsh accomplish its goals over the next year.

In recognition of our particular interest in having you remain with the organization, we are granting you a special retention award in the amount of $300,000. This award will be paid in cash, and/or readily tradable MMC Stock, as determined by the Company at the time of payment. The award will be paid to you quarterly, over one year, on or around the following dates:

- March 31, 2005          10% of total award
- June 30, 2005           15% of total award
- September 30, 2005      25% of total award
- December 31, 2005       50% of total award

Further details of this award are attached.

You have also been granted an additional equity award of $200,000. This award will vest over 3 years, 1/3 on each anniversary of the award date. More details on this equity award will be sent to you by MMC next month.

If you have questions, please feel free to raise them with the Business Leader who is communicating this award to you, or with your senior HR leader.

I know you will agree with me when I say that we all look forward to the continued success of the firm. On behalf of senior management throughout the organization, thank you again for your contribution to Marsh.

Sincerely,

Mike Cherkasky

Marsh • Putnam • Mercer
Marsh & McLennan Companies

**Special Retention Award**
November 18, 2004

**Terms and Conditions**

This award will be paid to you quarterly, over one year, on or around the following dates:

| | | |
|---|---|---|
| • | March 31, 2005 | 10% of total award |
| • | June 30, 2005 | 15% of total award |
| • | September 30, 2005 | 25% of total award |
| • | December 31, 2005 | 50% of total award |

- The award will be paid in cash and/or readily tradable MMC Stock, as determined by the Company at the time of payment. Stock payments, if any, will be valued at the time of payment.

- To be eligible to receive each award payment, you must be actively employed by the Company on the last day of the quarter preceding the payment date, and not serving notice of your resignation at the time.

  - Example: to receive the March 31, 2005 award you must be actively employed on December 31, 2004 and not have submitted notice of resignation on or before December 31, 2004. To receive the June 30, 2005 payment you must be actively employed on March 31, 2005 and not have submitted notice of resignation on or before March 31, 2005.

- If you leave the organization voluntarily, you may retain the portion of the award previously paid and receive the award for the quarter in which you resign based on the eligibility requirements described above. However, you forfeit future payments.

  - Example: if you resign on April 2, 2005 you receive the June 30, 2005 payment, given that you were employed on March 31, 2005, but you would not receive the September 30, 2005 or December 31, 2005 payments.

- If you are terminated involuntarily, not for Cause, you will be eligible to receive the payment for the full quarter in which you are terminated, but will not receive future payments.

- If you are terminated for Cause, you will forfeit all future payments and be required to repay all prior retention award payments, including the value, determined at the time of payment, of any shares received. For the purpose of this retention award, a termination "for Cause" is defined as misconduct, including any act or behavior that violates the Company's policies or standards of conduct, or may subject the individual or the Company to civil or criminal liability.

A3



Michael G. Cherkasky

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036
212 345 5550  Fax  212 345 3570
Michael.Cherkasky@MMC.com
www.mmc.com

November 18, 2004

Jeffrey Lattmann
New York, NY

Dear Jeffrey,

I want to thank you for all the work you have done to date to help rebuild our organization.  There is still much to be accomplished and we look forward to you being part of the team that will help Marsh accomplish its goals over the next year.

In recognition of our particular interest in having you remain with the organization, we are granting you a special retention award in the amount of $104,000.  This award will be paid in cash, and/or readily tradable MMC Stock, as determined by the Company at the time of payment. The award will be paid to you quarterly, over one year, on or around the following dates:

- March 31, 2005            10% of total award
- June 30, 2005             15% of total award
- September 30, 2005        25% of total award
- December 31, 2005         50% of total award

Further details of this award are attached.  In addition, if you have questions, please feel free to raise them with the Business Leader who is communicating this award to you, or with your senior HR leader.

I know you will agree with me when I say that we all look forward to the continued success of the firm.  On behalf of senior management throughout the organization, thank you again for your contribution to Marsh.

Sincerely,

Mike Cherkasky

**Special Retention Award**
November 18, 2004

**Terms and Conditions**

This award will be paid to you quarterly, over one year, on or around the following dates:

- March 31, 2005            10% of total award
- June 30, 2005             15% of total award
- September 30, 2005        25% of total award
- December 31, 2005         50% of total award

- The award will be paid in cash and/or readily tradable MMC Stock, as determined by the Company at the time of payment. Stock payments, if any, will be valued at the time of payment.

- To be eligible to receive each award payment, you must be actively employed by the Company on the last day of the quarter preceding the payment date, and not serving notice of your resignation at the time.

  – Example: to receive the March 31, 2005 award you must be actively employed on December 31, 2004 and not have submitted notice of resignation on or before December 31, 2004. To receive the June 30, 2005 payment you must be actively employed on March 31, 2005 and not have submitted notice of resignation on or before March 31, 2005.

- If you leave the organization voluntarily, you may retain the portion of the award previously paid and receive the award for the quarter in which you resign based on the eligibility requirements described above. However, you forfeit future payments.

  – Example: if you resign on April 2, 2005 you receive the June 30, 2005 payment, given that you were employed on March 31, 2005, but you would not receive the September 30, 2005 or December 31, 2005 payments.

- If you are terminated involuntarily, not for Cause, you will be eligible to receive the payment for the full quarter in which you are terminated, but will not receive future payments.

- If you are terminated for Cause, you will forfeit all future payments and be required to repay all prior retention award payments, including the value, determined at the time of payment, of any shares received. For the purpose of this retention award, a termination "for Cause" is defined as misconduct, including any act or behavior that violates the Company's policies or standards of conduct, or may subject the individual or the Company to civil or criminal liability.

A3

# EXHIBIT B

a disability leave of absence, for a period of six (6) months or more; or

(ix) he/she commences new employment prior to the Termination Date.

c. In addition, an employee may not be eligible for severance benefits under this Plan if he/she is entitled to severance/notice pay as a matter of law, or is covered by an individual employment agreement or any other contractual arrangement:

(i) providing for continuation of salary and/or other payments or benefits if he/she is terminated before a certain date and/or providing for severance benefits; or

(ii) where the Company would be obligated to continue his/her salary and/or other payments or benefits after his/her termination because of a contractual guarantee; or

(iii) where the employee has executed or entered into a Memorandum of Agreement or other agreement with a company acquired by the Company or by a related company that provides for a termination notice period of greater than fifteen (15) days.

In that case, the employee will be eligible to receive the greater of: (A) the benefits provided for under the employment agreement or other contractual arrangement or the severance/notice pay to be provided as a matter of law; or (B) provided the employee executes a Waiver and Release Agreement in the form and within the time required by the Company, the benefits provided for under this Plan. In no event will an employee be entitled to receive benefits under both the employment agreement, other contractual arrangement, or under law, and this Plan.

## 3. Severance Benefits

The following severance benefits are provided for under this Plan. If, by virtue of the nature of the employee's termination, he/she is eligible for notice of termination pursuant to the federal Worker Adjustment Retraining &

Notification Act ("WARN") or any similar state or local plant or facility closing law, his/her severance benefits under this Plan shall be reduced by such statutory notice entitlement.

a. Basic Severance Benefit

Except as otherwise provided in this Section 3, an employee who meets the eligibility requirements of Section 2 above ("Plan Participant") will be eligible to receive Basic Severance Pay equal to two (2) weeks' Base Salary (as defined below).

b. Enhanced Severance Benefits

In lieu of the Basic Severance Benefit described above, a Plan Participant who executes and returns a Waiver and Release Agreement in the form and within the time required by the Company, the terms of which are incorporated herein by reference and which may include, without limitation, non-solicitation provisions, will be eligible to receive Enhanced Severance Benefits as follows:

(i) Enhanced Severance Pay

With the exception of Managing Directors, a Plan Participant eligible for Enhanced Severance Pay will receive Enhanced Severance Pay based on the chart below and the Plan Participant's Base Salary, as defined below. In no event, however, will Enhanced Severance Pay exceed one (1) year's Base Salary. Managing Directors eligible for Enhanced Severance Pay will receive one (1) year's Base Salary.

| Title | Enhanced Severance is the greater of: |
|---|---|
| Non-officer | 2 weeks of Base Salary per Year of Service* OR 1 month's Base Salary |
| Assistant Vice President | 2 weeks of Base Salary per Year of Service* OR 3 months' Base Salary |
| Vice President | 2 weeks of Base Salary per Year of Service* OR 6 months' Base Salary |
| Senior Vice President | 2 weeks of Base Salary per Year of Service* OR 9 months' Base Salary |
| Managing Director | 12 months' Base Salary |

*To a maximum of one (1) year's Base Salary.

- For purposes of determining the amount of Basic or Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, the term "Base Salary" means such Plan Participant's base salary including any applicable shift differential, but exclusive of overtime compensation, commissions, bonuses, other payments, or any fringe benefits or other forms of remuneration, as in effect on the Plan Participant's Termination Date. Any performance/merit reviews that are pending or in process as of the Termination Date also shall not be taken into account in determining a Plan Participant's Base Salary or the amount of Severance Pay. For a Plan Participant who has switched from part-time to full-time, or vice versa, during the twelve (12) month period preceding his/her Termination Date, his/her Base Salary shall be determined using the weighted average of his/her base salary during such prior twelve (12) month period.

- In addition, for purposes of determining the amount of Enhanced Severance Pay a Plan

Participant is eligible to receive under the terms of this Plan, a Plan Participant will be credited with a Year of Service for each completed twelve (12) month period with the Company or any related company as measured from the Plan Participant's date of hire through the end of any Basic Severance period.  Further, if a Plan participant has worked for a partial year of service, he/she will be credited with 1/12 of a Year of Service for each completed month or portion thereof.  For rehires or employees with a change in employment status, the start dates of service for purposes of calculating severance will be the benefit vesting date under the general service rules applicable to the Marsh & McLennan Companies, Inc., United States Retirement Program. If applicable, appropriate service will be granted for continuous service with predecessor companies acquired by a Marsh & McLennan company. Notwithstanding the above, in no event will a Plan Participant be credited with Years of Service for any period for which the Plan Participant already received severance pay from the Company, any related company or any predecessor of the Company or related company.

(ii) Outplacement Counseling

A Plan Participant eligible for Enhanced Severance Pay will be eligible to receive, upon request, outplacement benefits at the Company's expense, at a level, for a duration (as set forth below), and by an outplacement Company to be selected by the Plan Administrator.  Outplacement counseling must commence no later than sixty (60) days following the Termination Date.  If the Plan Participant chooses not to participate in outplacement counseling as offered under this Plan, the Company will not provide the Plan Participant with any additional compensation in lieu thereof.

# EXHIBIT C -1

This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act Of 1933.

MARSH & McLENNAN COMPANIES
2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions for March 17, 2004 Award of Nonqualified Stock Options
to U.S. Grant Recipients

The award of nonqualified stock options granted on March 17, 2004 under the Marsh & McLennan Companies (MMC) 2000 Employee Incentive and Stock Award Plan (the Plan) is subject to the following terms and conditions:

I.   VESTING OF OPTION

Subject to your continued employment, twenty-five percent (25%) of the aggregate number of shares covered by these options will vest and become exercisable each March 17 beginning March 17, 2005. Subject to the provisions of Section V herein, in the event of your Death, Permanent Disability, Early, Normal or Deferred Retirement, unvested options will vest at such termination and become exercisable. For all other terminations of employment, unvested options will not vest and vested options will cease to be exercisable as of the date of such termination.

II.  METHOD OF EXERCISE

When you decide to exercise a stock option, you must follow the steps set forth below. Your option exercise will be effective the date on which we receive your stock option exercise letter (the Notice of Exercise of Option Letter), option exercise payment and Non-Solicitation Agreement or, if received on different days, the later of those dates.

A.   Notice of Exercise of Option Letter

Send your Notice of Exercise of Option Letter to:

For MMC Insiders (i.e.,
MMC Executive Officer, MMC Controller)
Kelly Gamble
Senior Manager, Global Compensation
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2774
Facsimile Number: (212) 345-4767

For All Other Option Holders
Emmanuel C. Victorino
Senior Executive Compensation Administrator
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2774
Facsimile Number: (212) 345-4767

The Notice of Exercise of Option Letter should follow the format of one of the attached sample letters. Your letter must set forth the following information:

1. The number of shares that you wish to acquire through your option exercise, the grant date of the option; and

2. The method of payment for exercising the option:  U.S. dollars, MMC common stock, or a combination of U.S. dollars and MMC common stock; and

3. The method of payment for applicable withholding taxes:  cash payment or share withholding; and

4. The method of share distribution:

   a. For shares distributed electronically in book entry form; include company name, contact person, Depository Trust Company (DTC) number, telephone and facsimile number.

   b. For shares distributed in stock certificate form; include the number of certificates to be prepared, the address to which they should be distributed, and (if different) the address to which other shareholder communications and dividends (with respect to these certificates) should be directed.

We will not accept oral notices of exercise of options, and you must purchase a minimum of 200 shares (unless acquiring all vested shares from the option grant).

B. Payment

Notice of Exercise of Option Letters will not be processed until we receive payment.  Payment may be made with (I) U.S. dollars, (2) MMC common stock or (3) a combination of U.S. dollars and MMC common stock as follows:

1. Payment with U.S. Dollars

Send a certified or bank check, payable to Marsh & McLennan Companies, Inc., for the full amount of the exercise price, or wire transfer the full amount in U.S. dollars to account number 910-2-741874 (ABA #021000021) at Chase Manhattan Bank in New York.  Wire transfers are not considered "received" until the date on which Chase confirms that the funds have been transferred to our account.

2. Payment with Shares of MMC Common Stock

You may pay for the exercise of an option by tendering shares of MMC common stock (including shares acquired from the Stock Purchase Plan, a stock option exercise or a stock award vesting) which you have owned for at least six months prior to the exercise date, having a value equal to or greater than the aggregate exercise price, as follows:

a. <u>Delivery of Stock Certificate(s)</u>

The stock certificate(s) must be delivered to MMC

(1) endorsed to Marsh & McLennan Companies, Inc. (the assignee)

- or -

(2) accompanied by a stock power endorsed to Marsh & McLennan Companies, Inc.

The endorsement must be identical to the registrant's name indicated on the face of the certificate. <u>The signature of endorsement must be guaranteed by a commercial bank or stockbroker.</u> Attached is a sample of an endorsed stock certificate. [Note: If the certificate is mailed, you might consider making the endorsement on a stock power (2 above), and then mailing it separately.]

b. <u>Valuation of Shares</u>

Any shares delivered as either partial or full payment of the exercise price of an option will be valued at the Fair Market Value of MMC common stock. Fair Market Value on a given date means the per share value of stock as determined by using the average of the high and low selling prices of such stock on the <u>immediately preceding date</u> (or, if the New York Stock Exchange was not open that day, the next preceding day that the NYSE was open for trading and the stock was traded) as reported for such date in the table entitled "NYSE Composite Transactions", contained in <u>The Wall Street Journal</u> or an equivalent successor table. For example, for a stock option exercise on April 5th, the Fair Market Value of shares tendered, on a per share basis, would be the average of the high and low selling prices of MMC common stock on April 4th.

If the stock submitted for payment exceeds the number of shares required, the excess shares will be returned to you.

3. <u>Payment with a Combination of U.S. Dollars and MMC Common Stock</u>

As noted in "Valuation of Shares" above, shares used in payment of your stock option exercise will be valued at the Fair Market Value of MMC common stock. Once the value of the shares tendered has been determined, you will owe MMC a check if the aggregate exercise price exceeds the value of the tendered shares. Failure to pay the full purchase price within five days of the date of exercise may void the Notice of Exercise of Option Letter.

C. Non-Solicitation Agreement

You must sign a Non-Solicitation Agreement in order to exercise the March 17, 2004 stock option, unless you are exercising the option after taking Normal or Deferred Retirement.

1. While Employed

A Non-Solicitation Agreement must accompany your Notice of Exercise of Option Letter. The Agreement must follow the form of the sample Agreement attached in this package and be signed and dated by you. We recommend you retain a copy of the Agreement for your records and consult an attorney before signing the Agreement.

2. Upon Early Retirement

If you take early retirement, you must sign the Non-Solicitation Agreement that is described in Section V in order to keep a vested option from expiring. A sample Agreement is attached for your use if you take early retirement and have a vested option.

III. WITHHOLDING TAXES

Payment of withholding taxes (including FICA) is required by law when a nonqualified stock option is exercised. An election to satisfy all applicable withholding taxes, either (1) by check or (2) by having a sufficient number of the shares resulting from the option exercise retained by MMC, must be made on or before the exercise date (see sample letters). If such an election is not made by that time then, by default, shares will be retained to satisfy the tax withholding obligation. The election to have shares withheld is irrevocable but is subject to disapproval by the Compensation Committee of the MMC Board of Directors (the Committee). Such shares will be valued at the Fair Market Value of MMC common stock.

IV. REGISTRATION AND DISTRIBUTION OF SHARES

A. The shares from your stock option exercise will be registered as specified in your Notice of Exercise of Option Letter, after you have fully paid for your exercise. The shares may be registered only in your name or that of you and your spouse as joint tenants.

B. The shares from your stock option exercise will be distributed as specified in your Notice of Exercise of Option Letter, after you have satisfied your payroll tax obligation.

C. When you exercise your stock option, you will receive written confirmation of the transaction.

D. Shares received upon your exercise of a stock option will be registered in your name (or you and your spouse as joint tenants, at your request) as of the date of exercise, and you will receive the quarterly dividend so long as you remain a registered shareholder on the dividend record date.

V.   TERMINATION OF EMPLOYMENT

If your employment with MMC or any of its subsidiaries or affiliates (the Company) terminates, the following shall apply:

A.   Death

In the event of your death, any unvested option will vest and become exercisable.  The person or persons to whom your rights under the option shall pass by will or the laws of descent and distribution shall be entitled to exercise such option within one year after the date of death, but in no event shall the option be exercised beyond the expiration date of the grant.

B.   Permanent Disability

Should you terminate due to total and permanent disability as determined under MMC's long-term disability program, any unvested option will vest at such termination and become exercisable.  Vested option shares shall be exercisable after your termination of employment, but in no event beyond the expiration date of the grant.

C.   Normal or Deferred Retirement

In the event of retirement from the Company, any unvested option will vest at such termination and become exercisable.  Vested option shares shall be exercisable after your Retirement Date (whether such Retirement Date is a Normal Retirement Date or Deferred Retirement Date), but in no event beyond the expiration date of the grant.

D.   Early Retirement

In the event of retirement from the Company, any unvested option will vest at such termination and become exercisable.  In the case of your Retirement Date being an Early Retirement Date, any then vested option shares shall continue to be exercisable for five years from your Early Retirement Date, but in no event beyond the expiration date of the grant, provided that you execute the attached Non-Solicitation Agreement for Early Retirees, and in fact do, comply with said Non-Solicitation Agreement, for a period of three years commencing with your Early Retirement Date, or such lessor period as may be applicable, it being understood that failure to comply with said Non-Solicitation Agreement will cause your early retirement to be governed by the provisions of "F.  All Other Employment Terminations", below.

E.   Definitions

As used in Section V. C. and D., the terms Retirement Date, Normal Retirement Date, Deferred Retirement Date and Early Retirement Date shall have the respective meanings given such terms (or any comparable substitute terms or concepts) set forth in the Company's primary retirement plan applicable to you upon your retirement.

F.   All Other Employment Terminations

All option shares will cease to be exercisable on the date of termination due to termination for any other reason than specified above, except to the extent that the Committee may determine otherwise.

5

## VI.  CHANGE IN CONTROL PROVISIONS

### A.  Change in Control

Upon the occurrence of a "change in control" of MMC, as defined in the Plan, all stock options you hold will become fully exercisable and vested, and any restrictions contained in the terms and conditions of the option grants shall lapse.

### B.  Additional Payment

If you exercise option shares that have become exercisable because of a change in control, all or a portion of the gain (the total market price for the shares on the date of exercise minus the total exercise price) on those shares may be subject to a 20% federal excise tax.  The excise tax is imposed when the gain (plus any other payments, which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you exercise stock options whose vesting has been accelerated, MMC will determine if the excise tax is payable.  If it is payable, MMC will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money.  If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you.  If the Additional Payment is more than the amount you owe, you will be required to reimburse MMC for the difference.

## VII.  OTHER PROVISIONS

### A.
Neither the granting of an award nor any exercise thereof gives you any right to continue to be employed by the Company, or restricts, in any way, the right of your employer to terminate your employment at any time for any reason not specifically prohibited by law.

### B.
During your lifetime, an option shall be exercisable only by you, and no right thereunder shall be transferable except by will or the laws of descent and distribution.

### C.
Neither you nor any person entitled to exercise your rights in the event of your death shall have any of the rights of a stockholder with respect to the shares of MMC common stock subject to an option, unless, and until, you have exercised the option, paid the full price thereof, and have received the shares so acquired.

### D.
MMC is not liable for the non-issuance or non-transfer or any delay in the issuance or transfer of any shares of MMC common stock subject to an option or otherwise pursuant to the Plan which results from the inability of MMC to obtain, or in any delay in obtaining, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of MMC common stock, if counsel for MMC deems such authority necessary for the lawful issuance or transfer of any such shares.

E. An award is subject to all of the terms and conditions of the Plan and your acceptance of an award shall constitute your agreement to the terms and conditions of the Plan and the administrative regulations of the Committee. Your acceptance of an award constitutes your agreement that the shares of MMC common stock acquired hereunder will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations. In the event of any conflict between the Plan and the terms and conditions of the Plan, the Plan shall prevail.

F. An option shall be exercised in accordance with, and awards shall be subject to, such additional administrative regulations as the Committee may from time to time adopt. All decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding.

G. The Plan, and the granting and exercising of options or awards thereunder, and the obligations of MMC and employees under the Plan, shall be subject to all applicable governmental laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required, including, but not limited to, tax and securities regulations. This provision takes precedence over all aforementioned terms and conditions.

Please retain this document in your permanent records. If you have any questions regarding the Plan or your stock option grant, please contact Ms. Kelly Gamble, Senior Manager, Global Compensation, at (212) 948-3523 or Mr. Emmanuel C. Victorino, Senior Executive Compensation Administrator, at (212) 345-3543. Both also can be reached via internal electronic mail (Lotus Notes) or the internet (kelly.gamble@mmc.com; emmanuel.c.victorino@mmc.com).

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the Exchange Act), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Ms. Kelly Gamble or Mr. Emmanuel C. Victorino as indicated above.

<u>Attachments</u>
Non-Solicitation Agreements
Notice of Exercise of Option Letters
Sample Endorsement of Stock Certificate
Tax Information Memorandum

t&c03172004option-usa
March 8, 2004

Marsh & McLennan Companies, Inc.
<u>Non-Solicitation Agreement for Exercise of Stock Options</u>

In order to receive the benefits afforded by the Marsh & McLennan Companies 1988 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1992 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1997 Employee Incentive and Stock Award Plan, the Marsh & McLennan Companies 2000 Employee Incentive and Stock Award Plan, or any successor plan thereto (collectively, the Plan), as each may be amended from time to time, I, the undersigned, agree that if my employment with Marsh & McLennan Companies, Inc. or one of its subsidiaries (the Company) terminates for any reason other than death or total disability within three (3) years after exercising the option granted to me on _____ under the Plan, I will not, for a period of two (2) years from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b) solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.

I recognize and acknowledge that the Company's trade secrets and confidential or proprietary information, including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which were essential to the performance of my duties while in the employ of the Company.  I will not, during or after the term hereof, in whole or in part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall I make use of any such property for my own purposes or for the benefit of any person, firm, corporation or other entity (except the Company) under any circumstances, during or after the term hereof, provided that after the term hereof, these restrictions shall not apply to such secrets or information which are then in the public domain (provided that I was not responsible, directly or indirectly, for such secrets or information entering the public domain without the Company's consent).

Without limiting any other remedies which may be available to it under applicable law, the Company shall be entitled to monetary damages under this agreement, which may include, but not be limited to, the gain on exercise of the option computed as the difference between the option price and the market price on the date of exercise multiplied by the number of shares exercised.

I understand that the agreement applies only to this particular option grant and does not take precedence over or affect other non-solicitation agreements that I may have with the Company.

This agreement shall be construed in accordance with the laws of the State of New York.

Name (Print): _____        SS#: _____

Signature: _____        Date: _____

t&c\03172004option-usa
March 8, 2004

Marsh & McLennan Companies, Inc.
<u>Non-Solicitation Agreement for Early Retirees</u>

In order to extend the expiration date of Participant's stock option granted on <u>(grant date(s))</u> under the Marsh & McLennan Companies 1988 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1992 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1997 Employee Incentive and Stock Award Plan, the Marsh & McLennan Companies 2000 Employee Incentive and Stock Award Plan, or any successor plan thereto (collectively, the Plan), as each may be amended from time to time, beyond <u>(early retirement date)</u>, his Early Retirement Date at <u>(employer)</u>, to the earlier of <u>(expiration date)</u> or the original expiration date of the applicable grant, Participant agrees that until <u>(non-solicitation date)</u> he will not, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation:

(a)  solicit or accept business of the type offered by Marsh & McLennan Companies, Inc. or one of its subsidiaries (the Company) during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b)  solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.

Participant recognizes and acknowledges that the Company's trade secrets and confidential or proprietary information, including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which are essential to the performance of the duties of Participant hereunder. Participant will not, during or after the term hereof, in whole or in part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Participant make use of any such property for his own purposes or for the benefit to any person, firm, corporation or other entity (except the Company) under any circumstances, during or after the term hereof, provided that after the term hereof these restrictions shall not apply to such secrets or information which are then in the public domain (provided that he was not responsible, directly or indirectly, for such secrets or information entering the public domain without the Company's consent).

Name (Print): _____     SS#: _____

Signature: _____     Date: _____

t&c\03172004option-usa
March 8, 2004

**Sample Notice of Exercise of Option Letter**
**Payment with Cash by U.S. Employees**

Date

Mr. Emmanuel C. Victorino                [Note:  Those employees who are insiders
Senior Executive Compensation Administrator    (i.e., MMC Executive Officer or MMC Controller) should
Marsh & McLennan Companies, Inc.            direct their correspondence to Ms. Kelly Gamble, Senior Manager,
1166 Avenue of the Americas                 Global Compensation.]
New York, NY  10036-2774

Dear Manny:

I would like to exercise the stock option granted to me on _____ to acquire _____ shares of Marsh & McLennan Companies, Inc. common stock at U.S.$_____ per share. Enclosed is a check for U.S.$_____ representing the full payment for this option exercise.

Also, enclosed is a non-solicitation agreement signed by me.

Please register the shares as follows:

      Name:    _____   Empl. ID #:  _____

      Address:  _____

              _____

**(Include one of the two following sentences.)**

Please distribute the shares via book entry form as follows:

      Company:  _____  DTC #:  _____

      Contact:  _____  Tele. #:  _____

                                   Fax #:  _____

Please distribute the shares in stock certificate form as follows:

      _____ certificates for _____ shares each and 1 certificate for _____ shares to:

      Name:    _____

      Address:  _____

              _____

**(Include one of the following sentences for nonqualified stock option exercises only.)**

I authorize the Company to withhold a sufficient number of shares from the amount I would otherwise be due to receive as a result of this option exercise, in order to cover all applicable payroll taxes.

I agree to remit a check for all applicable payroll taxes upon the Company's request and understand that the shares will not be released until the tax payment has been received by you.  (My office telephone number is _____.)

Sincerely,

t&c\03172004option-usa
March 8, 2004

**Sample Notice of Exercise of Option Letter**
**Payment with Shares and Cash by U.S. Employees**

Date

Mr. Emmanuel C. Victorino
Senior Executive Compensation Administrator
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

[Note: Those employees who are insiders
(i.e., MMC Executive Officer or MMC Controller) should
direct their correspondence to Ms. Kelly Gamble, Senior Manager,
Global Compensation.]

Dear Manny:

I would like to exercise the stock option granted to me on _____ to acquire _____ shares of Marsh & McLennan Companies, Inc. common stock at U.S.$_____ per share. Therefore, the cost of this option exercise is U.S.$_____.

In payment for this exercise, enclosed are _____ shares of MMC common stock (which I have owned for at least six months) of which I am using _____* shares to be valued at U.S.$_____/share* (the Fair Market Value of MMC common stock on _____*), for a total market value of U.S.$_____*. I understand that I must send you a check for the balance of the exercise cost within five business days.

*[Note:  To be filled in by the Company upon receipt of letter.]

Also, enclosed is a non-solicitation agreement signed by me.

Please register the shares as follows:

Name:    _____    Empl. ID #:  _____

Address:    _____

_____

(Include one of the two following sentences.)

Please distribute the shares via book entry form as follows:

Company:    _____    DTC #:  _____

Contact:    _____    Tele. #:  _____

Fax #:  _____

Please distribute the shares in stock certificate form as follows:

_____ certificates for _____ shares each and 1 certificate for _____ shares to:

Name:    _____

Address:    _____

_____

(Include one of the following sentences for nonqualified stock option exercises only.)

I authorize the Company to withhold a sufficient number of shares from the amount I would otherwise be due to receive as a result of this option exercise, in order to cover all applicable payroll taxes.

I agree to remit a check for all applicable payroll taxes upon the Company's request and understand that the shares will not be released until you have received the tax payment.  (My office telephone number is _____.)

Sincerely,

t&c\03172004option-usa
March 8, 2004

## MARSH & McLENNAN COMPANIES, INC.

MARSH & McLENNAN COMPANIES, INC. WILL FURNISH WITHOUT CHARGE TO EACH STOCK-HOLDER WHO SO REQUESTS A STATEMENT OR SUMMARY OF THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF WHICH THE CORPORATION IS AUTHORIZED TO ISSUE AND OF THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS. ANY SUCH REQUEST IS TO BE ADDRESSED TO THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE.

This certificate also evidences and entitles the holder hereof to certain Rights as set forth in the Rights Agreement dated as of September 17, 1987 (as amended from time to time, the "Rights Agreement"), the terms of which are hereby incorporated herein by reference and a copy of which is on file at the principal offices of the Company. Under certain circumstances, as set forth in the Rights Agreement, such Rights will be evidenced by separate certificates and will no longer be evidenced by this certificate. The Company will mail to the holder of this certificate a copy of the Rights Agreement, as in effect on the date of mailing, without charge promptly after receipt of a written request therefor. Under certain circumstances set forth in the Rights Agreement, Rights issued to, or held by, any Person who is, was or becomes an Acquiring Person or any Affiliate or Associate thereof (as such terms are defined in the Rights Agreement), whether currently held by or on behalf of such Person or by any subsequent holder, may become null and void.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM —as tenants in common  
TEN ENT —as tenants by the entireties  
JT TEN —as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT/TRANSFERS MIN ACT— _____ Custodian _____  
(Cust)                (Minor)  
under Uniform Gifts to Minors  
Act _____  
(State)

Additional abbreviations may also be used though not in the above list.

*For value received,* _____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

| 36-2668272 | Marsh & McLennan Companies, Inc. |

1166 Avenue of the Americas, New York, NY 10036

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE.

One Thousand (1,000) *Shares*

*of the capital stock represented by the within Certificate, and do hereby irrevocably constitute and appoint* _____

Leave Blank

*Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated,* April 1, 2001

_____  
(Signature as name appears on face of certificate)

Signature guaranteed by  
(Commercial Bank or New York Stock Exchange Member Firm)

Signature (Stamp) _____  
Date _____

# EXHIBIT C -2

MARSH & McLENNAN COMPANIES, INC.

2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

# MARSH & McLENNAN COMPANIES, INC.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

| | | |
|---|---|---|
| 1. | Purposes. | 1 |
| 2. | Definitions. | 1 |
| 3. | Administration. | 3 |
| | (a) Authority of the Committee. | 3 |
| | (b) Manner of Exercise of Committee Authority. | 4 |
| | (c) Limitation of Liability. | 5 |
| 4. | Eligibility. | 5 |
| 5. | Stock Subject to the Plan; Adjustments. | 5 |
| | (a) Shares Reserved. | 5 |
| | (b) Manner of Counting Shares. | 6 |
| | (c) Type of Shares Distributable. | 6 |
| | (d) Adjustments. | 6 |
| 6. | Specific Terms of Awards. | 6 |
| | (a) General. | 6 |
| | (b) Options. | 6 |
| | (c) SARs. | 7 |
| | (d) Restricted Stock. | 7 |
| | (e) Deferred Stock Units. | 8 |
| | (f) Stock Bonuses and Stock Awards in Lieu of Cash Awards. | 9 |
| | (g) Dividend Equivalents. | 9 |
| | (h) Other Stock-Based Awards. | 9 |
| | (i) Unit-Based Awards. | 9 |
| 7. | Certain Provisions Applicable to Awards. | 9 |
| | (a) Stand-Alone, Additional, Tandem and Substitute Awards. | 9 |
| | (b) Terms of Awards. | 10 |
| | (c) Form of Payment Under Awards. | 10 |
| | (d) Buyouts. | 10 |
| | (e) Cancellation and Rescission of Awards. | 10 |
| | (f) Awards to Participants Outside the United States. | 10 |
| 8. | Performance Awards. | 10 |

MARSH & McLENNAN COMPANIES, INC.

2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

| | | |
|---|---|---|
| 9. | Change in Control Provisions. | 11 |
| (a) | Acceleration Upon Change in Control. | 11 |
| (b) | "Change in Control" Defined. | 11 |
| (c) | "Change in Control Price" Defined. | 11 |
| (d) | Additional Payments. | 12 |
| (e) | Pooling of Interests. | 12 |
| | | 13 |
| 10. | General Provisions. | 13 |
| (a) | Compliance with Legal and Exchange Requirements. | 13 |
| (b) | Nontransferability. | 13 |
| (c) | No Right to Continued Employment. | 13 |
| (d) | Taxes. | 14 |
| (e) | Changes to the Plan and Awards. | 14 |
| (f) | No Rights to Awards; No Stockholder Rights. | 14 |
| (g) | Unfunded Status of Awards and Trusts. | 14 |
| (h) | Nonexclusivity of the Plan. | 14 |
| (i) | No Fractional Shares. | 15 |
| (j) | Governing Law. | 15 |
| (k) | Effective Date. | 15 |
| (l) | Titles and Headings; Certain Terms. | 15 |
| | | 15 |

## MARSH & McLENNAN COMPANIES, INC.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

**1.     *Purposes.*** The purposes of the 2000 Employee Incentive and Stock Award Plan are to advance the interests of Marsh & McLennan Companies, Inc. and its stockholders by providing a means to attract, retain, and motivate employees of the Company and its Subsidiaries and Affiliates, and to strengthen the mutuality of interest between such employees and the Company's stockholders. This Plan shall be the successor to the Marsh & McLennan Companies, Inc. 1997 Employee Incentive and Stock Award Plan.

**2.     *Definitions.*** For purposes of the Plan, the following terms shall be defined as set forth below:

**(a)**     "Affiliate" means any entity other than the Company and its Subsidiaries that is designated by the Committee as a participating employer under the Plan, provided that the Company directly or indirectly owns at least 20% of the combined voting power of all classes of voting stock of such entity or at least 20% of the ownership interests in such entity.

**(b)**     "Award" means any Option, SAR, Restricted Stock, Deferred Stock Unit, Stock Bonus or Stock Award in Lieu of Cash, Dividend Equivalent, Other Stock-Based Award, or Unit-Based Award, including Performance Awards granted to a Participant under the Plan.

**(c)**     "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award.

**(d)**     "Beneficiary" means the person, persons, trust or trusts which have been designated by such Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under this Plan upon the death of the Participant, or, if there is no designated Beneficiary or surviving designated Beneficiary, then the person, persons, trust or trusts entitled by will or the laws of descent and distribution to receive such benefits.

**(e)**     "Board" means the Board of Directors of the Company.

**(f)**     "Change in Control" means Change in Control as defined with related terms in Section 9.

**(g)**     "Code" means the Internal Revenue Code of 1986, as amended from time to time. References to any provision of the Code shall be deemed to include successor provisions thereto and regulations thereunder.

**(h)**     "Committee" means the Compensation Committee of the Board, or such other Board committee as may be designated by the Board to administer the Plan. The Committee shall consist solely of two or more directors of the Company.

**(i)**     "Company" means Marsh & McLennan Companies, Inc., a corporation organized under the laws of the State of Delaware, or any successor corporation.

(j)    "Deferred Stock Unit" means an award, granted to a Participant under Section 6(e), representing the right to receive either Stock or cash or any combination thereof at the end of a specified deferral period.

(k)    "Dividend Equivalent" means a right, granted to a Participant under Section 6(g), to receive cash, Stock, or other property equal in value to dividends paid with respect to a specified number of shares of Stock or to periodic distributions on other specified equity securities of the Company or any Subsidiary or Affiliate. Dividend Equivalents may be awarded on a free-standing basis or in connection with another Award and may be paid currently or on a deferred basis.

(l)    "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time. References to any provision of the Exchange Act shall be deemed to include successor provisions thereto and regulations thereunder.

(m)    "Fair Market Value" means, with respect to Stock, Awards, or other property, the fair market value of such Stock, Awards, or other property determined by such methods or procedures as shall be established from time to time by the Committee. Unless otherwise determined by the Committee in good faith, the Fair Market Value of Stock as of any given date shall mean the per share value of Stock as determined by using the mean between the high and low selling prices of such Stock on the immediately preceding date (or, if the NYSE was not open that day, the next preceding day that the NYSE was open for trading and the Stock was traded) as reported for such date in the table titled "NYSE--Composite Transactions," contained in The Wall Street Journal or an equivalent successor table.

(n)    "Option" means a right, granted to a Participant under Section 6(b), to purchase Stock. No Options will qualify as incentive stock options within the meaning of Section 422 of the Code.

(o)    "Other Stock-Based Award" means a right, granted to a Participant under Section 6(h), that is denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock or other securities of the Company or any Subsidiary or Affiliate, including, without limitation, rights convertible or exchangeable into Stock or such other securities, purchase rights for Stock or such other securities, and Awards with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

(p)    "Participant" means a person who, as an employee of the Company, a Subsidiary or Affiliate, has been granted an Award under the Plan.

(q)    "Performance Award" means an Award of one of the types specified in Section 6 the grant, exercise, or settlement of which is subject to achievement of performance goals and other terms specified under Section 8.

(r)    "Plan" means this 2000 Employee Incentive and Stock Award Plan, as amended from time to time.

(s)    "Preexisting Plan and Share Resolutions" mean the 1997 Employee Incentive and Stock Award Plan and the resolutions adopted by the Board on November 16, 1993 (superseding resolutions adopted on March 17, 1992), as amended and supplemented by resolutions adopted on March 16, 1995 and May 15, 1996, relating to the authorization of two million (2,000,000) shares of Stock for deferred stock units or other compensation purposes.

(t)    "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3(b)(3).

(u)    "Restricted Stock" means an award of shares of Stock to a Participant under Section 6(d) that may be subject to certain restrictions and to a risk of forfeiture.

(v)    "Rule 16b-3" means Rule 16b-3, as from time to time in effect and applicable to the Plan and Participants, promulgated by the Securities and Exchange Commission under Section 16 of the Exchange Act.

(w)    "Stock" means the Common Stock, $1.00 par value per share, of the Company or such other securities as may be substituted or resubstituted therefor pursuant to Section 5.

(x)    "SAR" or "Stock Appreciation Right" means the right, granted to a Participant under Section 6(c), to be paid an amount measured by the appreciation in the Fair Market Value of Stock from the date of grant to the date of exercise of the right, with payment to be made in cash, Stock, other Awards, or other property as specified in the Award or determined by the Committee.

(y)    "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in the chain.

(z)    "Unit-Based Award" means a unit, granted to a Participant under Section 6(i), with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

3.    *Administration.*

(a)    *Authority of the Committee.*  The Plan shall be administered by the Committee. The Committee shall have full and final authority to take the following actions, in each case subject to and consistent with the provisions of the Plan:

(i)    to select Participants to whom Awards may be granted;

(ii)    to designate Affiliates;

(iii)    to determine the type or types of Awards to be granted to each Participant;

- 3 -

(iv)    to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate, the terms and conditions of any Award granted under the Plan (including any exercise price, grant price, or purchase price, any restriction or condition, any schedule for lapse of restrictions or conditions relating to transferability or forfeiture, exercisability, or settlement of an Award, and waivers or accelerations thereof, and waivers of performance conditions relating to an Award, based in each case on such considerations as the Committee shall determine), and all other matters to be determined in connection with an Award;

(v)    to determine whether, to what extent, and under what circumstances an Award may be settled, or the exercise price of an Award may be paid, in cash, Stock, other Awards, or other property, or an Award may be canceled, forfeited, exchanged, or surrendered;

(vi)    to determine whether, to what extent, and under what circumstances cash, Stock, other Awards, or other property payable with respect to an Award will be deferred either automatically, at the election of the Committee, or at the election of the Participant, and whether to create trusts and deposit Stock or other property therein;

(vii)    to prescribe the form of each Award Agreement, which need not be identical for each Participant;

(viii)    to adopt, amend, suspend, waive, and rescind such rules and regulations and appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(ix)    to correct any defect or supply any omission or reconcile any inconsistency in the Plan and to construe and interpret the Plan and any Award, rules and regulations, Award Agreement, or other instrument hereunder; and

(x)    to make all other decisions and determinations as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

Other provisions of the Plan notwithstanding, the Board may perform any function of the Committee under the Plan, including for the purpose of ensuring that transactions under the Plan by Participants who are then subject to Section 16 of the Exchange Act in respect of the Company are exempt under Rule 16b-3. In any case in which the Board is performing a function of the Committee under the Plan, each reference to the Committee herein shall be deemed to refer to the Board, except where the context otherwise requires.

(b)    *Manner of Exercise of Committee Authority*. At any time that a member of the Committee is not a Qualified Member, any action of the Committee relating to an Award to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company may be taken either (i) by a subcommittee composed solely of two or more Qualified Members, or (ii) by the Committee but with each such member who is not a Qualified Member abstaining or recusing himself or herself from such action, provided that, upon such abstention or recusal, the Committee remains composed solely of two or more Qualified Members. Such

- 4 -

action, authorized by such a subcommittee or by the Committee upon the abstention or recusal of such non-Qualified Member(s), shall be the action of the Committee for purposes of the Plan. Any action of the Committee with respect to the Plan shall be final, conclusive, and binding on all persons, including the Company, Subsidiaries, Affiliates, Participants, any person claiming any rights under the Plan from or through any Participant, and stockholders. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee. The Committee may delegate to officers or managers of the Company or any Subsidiary or Affiliate the authority, subject to such terms as the Committee shall determine, to perform administrative functions and such other functions as the Committee may determine, to the extent permitted under applicable law and, with respect to any Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, to the extent performance of such function will not result in a subsequent transaction failing to be exempt under Rule 16b-3(d).

(c)     *Limitation of Liability.*  Each member of the Committee shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any Subsidiary or Affiliate, the Company's independent certified public accountants, or other professional retained by the Company to assist in the administration of the Plan. No member of the Committee, nor any officer or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and any officer or employee of the Company acting on their behalf shall, to the fullest extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.     *Eligibility.*  Employees of the Company and Subsidiaries and Affiliates, other than senior executives who are then eligible to be granted awards under the 2000 Senior Executive Incentive and Stock Award Plan or any successor plan thereto, are eligible to be granted Awards under the Plan. In addition, any person who has been offered employment by the Company or a Subsidiary or Affiliate is eligible to be granted Awards under the Plan, provided that such prospective employee may not receive any payment or exercise any right relating to an Award until such person has commenced employment with the Company or a Subsidiary or Affiliate.

5.     *Stock Subject to the Plan; Adjustments.*

(a)     *Shares Reserved.*  Subject to adjustment as hereinafter provided, the total number of shares of Stock reserved for issuance in connection with Awards under the Plan shall be forty million (40,000,000), plus the additional number of shares of Stock specified in the succeeding sentence. There shall be added to the number of shares of Stock reserved for issuance under this Section 5(a) the number of shares authorized and reserved for awards available for grants of awards under the Preexisting Plan and Share Resolutions to the extent (A) that such shares were prior to the Effective Date or (B) that such shares were subject to outstanding awards under the Preexisting Plan and Share Resolutions and thereafter an event occurs or occurred (including expiration or forfeiture) which would result in such shares again being available for Awards under the Plan (as determined pursuant to Section 5(b)). No Award may be granted if the number of shares to which such Award relates, when added to the number of shares previously

- 5 -

issued under the Plan and the number of shares to which other then-outstanding Awards relate, exceeds the number of shares reserved under this Section 5(a). Shares of Stock issued under the Plan shall be counted against this limit in the manner specified in Section 5(b).

(b)     *Manner of Counting Shares.* If any shares subject to an Award or award pursuant to the Preexisting Plan and Share Resolutions are or were forfeited, canceled, exchanged, or surrendered or such Award or award is or was settled in cash or otherwise terminates or was terminated without a distribution of shares to the Participant, including (i) the number of shares withheld in payment of any exercise or purchase price of or tax obligation relating to such an Award or award and (ii) the number of shares equal to the number surrendered in payment of any exercise or purchase price of or tax obligation relating to any Award or award, such number of shares will again be available for Awards under the Plan. The Committee may make determinations and adopt regulations for the counting of shares relating to any Award to ensure appropriate counting, avoid double counting (in the case of tandem or substitute awards), and provide for adjustments in any case in which the number of shares actually distributed differs from the number of shares previously counted in connection with such Award.

(c)     *Type of Shares Distributable.* Any shares of Stock distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued shares or treasury shares, including shares acquired by purchase in the open market or in private transactions.

(d)     *Adjustments.* In the event that any large, special and non-recurring dividend or other distribution (whether in the form of cash or property other than Stock), recapitalization, forward or reverse split, Stock dividend, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the Stock such that an adjustment is determined by the Committee to be appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of (i) the number and kind of shares of Stock which may thereafter be issued in connection with Awards, (ii) the number and kind of shares of Stock issued or issuable in respect of outstanding Awards or, if deemed appropriate, make provisions for payment of cash or other property with respect to any outstanding Award, and (iii) the exercise price, grant price, or purchase price relating to any Award.

6.     *Specific Terms of Awards.*

(a)     *General.* Awards may be granted on the terms and conditions set forth in this Section 6. In addition, the Committee may impose on any Award or the exercise thereof, at the date of grant or thereafter (subject to Section 10(e)), such additional terms and conditions, not inconsistent with the provisions of the Plan, as the Committee shall determine, including terms regarding forfeiture of Awards or continued exercisability of Awards in the event of termination of employment by the Participant.

(b)     *Options.* The Committee is authorized to grant Options to participants on the following terms and conditions:

(i)     *Exercise Price.* The exercise price per share of Stock purchasable under an Option shall be determined by the Committee; provided, however, that, except as

- 6 -

provided in Section 7(a), such exercise price shall be not less than the Fair Market Value of a share on the date of grant of such Option, and in no event shall the exercise price for the purchase of shares be less than par value.

(ii)    Time and Method of Exercise.  The Committee shall determine at the date of grant or thereafter the time or times at which an Option may be exercised in whole or in part, the methods by which such exercise price may be paid or deemed to be paid, the form of such payment, including cash, Stock, other Awards, shares or units valued by reference to shares issued under any other plan of the Company or a Subsidiary or Affiliate (including shares or units subject to restrictions, so long as an equal number of shares issued upon exercise of the Option are subject to substantially similar restrictions), or notes or other property, and the methods by which Stock will be delivered or deemed to be delivered to Participants (including deferral of delivery of shares under a deferral arrangement).

(c)    SARs.  The Committee is authorized to grant SARs to Participants on the following terms and conditions:

(i)    Right to Payment.  An SAR shall confer on the Participant to whom it is granted a right to receive with respect to each share subject thereto, upon exercise thereof, the excess of (1) the Fair Market Value of one share of Stock on the date of exercise (or, if the Committee shall so determine in the case of any such right, the Fair Market Value of one share at any time during a specified period before or after the date of exercise, or the Change in Control Price as defined in Section 9(c)) over (2) the grant price of the SAR as of the date of grant of the SAR, which shall be not less than the Fair Market Value of one share of Stock on the date of grant of such SAR (or, in the case of an SAR granted in tandem with an Option, shall be equal to the exercise price of the underlying Option).

(ii)    Other Terms.  The Committee shall determine, at the time of grant or thereafter, the time or times at which an SAR may be exercised in whole or in part, the method of exercise, method of settlement, form of consideration payable in settlement, method by which Stock will be delivered or deemed to be delivered to Participants, whether or not an SAR shall be in tandem with any other Award, and any other terms and conditions of any SAR.  An SAR granted in tandem with an Option may be granted at the time of grant of the related Option or at any time thereafter.

(d)    Restricted Stock.  The Committee is authorized to grant Restricted Stock to Participants on the following terms and conditions:

(i)    Issuance and Restrictions.  Restricted Stock shall be subject to such restrictions on transferability and other restrictions, if any, as the Committee may impose at the date of grant or thereafter, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Committee may determine.  Except to the extent restricted under the Award Agreement relating to the Restricted Stock, a Participant granted Restricted Stock shall have all of the rights of a stockholder including the right to vote Restricted Stock and the right to receive dividends thereon.

- 7 -

(ii)     Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable restriction period, Restricted Stock, and any accrued but unpaid dividends or Dividend Equivalents, that is or are then subject to a risk of forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents will be waived in whole or in part in the event of terminations resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents.

(iii)     Certificates for Stock.  Restricted Stock granted under the Plan may be evidenced in such manner as the Committee shall determine.  If certificates representing Restricted Stock are registered in the name of the Participant, such certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, the Company shall retain physical possession of the certificate, and the Company may require the Participant to deliver a stock power, endorsed in blank, relating to the Restricted Stock.

(iv)     Dividends.  Dividends paid on Restricted Stock shall be either paid at the dividend payment date in cash or in shares of unrestricted Stock having a Fair Market Value equal to the amount of such dividends, or the payment of such dividends shall be deferred or the amount or value thereof automatically reinvested in additional Restricted Stock, Deferred Stock Units, other Awards, or other investment vehicles, as the Committee shall determine or permit the Participant to elect.  Stock distributed in connection with a Stock split or Stock dividend, and other property distributed as a dividend, shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Stock with respect to which such Stock or other property has been distributed.

(e)     *Deferred Stock Units.*  The Committee is authorized to grant Deferred Stock Units to Participants, subject to the following terms and conditions:

(i)     Award and Restrictions.  Delivery of Stock or cash, as the case may be, will occur upon expiration of the deferral period specified for Deferred Stock Units by the Committee (or, if permitted by the Committee, as elected by the Participant).  In addition, Deferred Stock Units shall be subject to such restrictions as the Committee may impose, if any, at the date of grant or thereafter, which restrictions may lapse at the expiration of the deferral period or at earlier or later specified times, separately or in combination, in installments or otherwise, as the Committee may determine.

(ii)     Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable deferral period or portion thereof to which forfeiture conditions apply (as provided in the Award Agreement evidencing the Deferred Stock Units), or upon failure to satisfy any other conditions precedent to the delivery of Stock or cash to which such Deferred Stock Units relate, all Deferred Stock Units, and any accrued but unpaid Dividend Equivalents, that are at that time subject to a risk of

- 8 -

forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Deferred Stock Units and any accrued but unpaid Dividend Equivalents will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Deferred Stock Units and any accrued but unpaid Dividend Equivalents.

(f)    *Stock Bonuses and Stock Awards in Lieu of Cash Awards.*  The Committee is authorized to grant Stock as a bonus, or to grant other Awards, in lieu of Company commitments to pay cash under other plans or compensatory arrangements.  Stock or Awards granted hereunder shall have such other terms as shall be determined by the Committee.

(g)    *Dividend Equivalents.*  The Committee is authorized to grant Dividend Equivalents to Participants.  The Committee may provide, at the date of grant or thereafter, that Dividend Equivalents shall be paid or distributed when accrued or shall be deemed to have been reinvested in additional Stock, or other investment vehicles as the Committee may specify.

(h)    *Other Stock-Based Awards.*  The Committee is authorized, subject to limitations under applicable law, to grant to Participants Other Stock-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter.  Stock or other securities or property delivered pursuant to an Award in the nature of a purchase right granted under this Section 6(h) shall be purchased for such consideration, paid for at such times, by such methods, and in such forms, including, without limitation, cash, Stock, other Awards, notes or other property, as the Committee shall determine, subject to any required corporate action.

(i)    *Unit-Based Awards.*  The Committee is authorized to grant to Participants Unit-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  Such Awards may be paid or settled in cash, Stock, other Awards or property.

7.    **Certain Provisions Applicable to Awards.**

(a)    *Stand-Alone, Additional, Tandem and Substitute Awards.*  Awards granted under the Plan may, in the discretion of the Committee, be granted either alone or in addition to, in tandem with, or in exchange or substitution for, any other Award granted under the Plan or any award granted under any other plan of the Company, any Subsidiary or Affiliate, or any business entity to be acquired by the Company or a Subsidiary or Affiliate, or any other right of a Participant to receive payment from the Company or any Subsidiary or Affiliate.  Awards may be granted in addition to or in tandem with such other Awards or awards may be granted either as of the same time as or a different time from the grant of such other Awards or awards.  The per share exercise price of any Option, grant price of any SAR, or purchase price of any other Award conferring a right to purchase Stock which is granted, in connection with the substitution of awards granted under any other plan of the Company or any Subsidiary or Affiliate or any business entity to be acquired by the Company or any Subsidiary or Affiliate, shall be determined by the Committee, in its discretion, and may, to the extent the Committee

determines necessary in order to preserve the value of such other award, be less than the Fair Market Value of a share on the date of grant of such substitute Award.

(b)     *Terms of Awards.*  The term of each Award shall be for such period as may be determined by the Committee.

(c)     *Form of Payment Under Awards.*  Subject to the terms of the Plan and any applicable Award Agreement, payments to be made by the Company or a Subsidiary or Affiliate upon the grant, maturation, or exercise of an Award may be made in such forms as the Committee shall determine at the date of grant or thereafter, including, without limitation, cash, Stock, or other property, and may be made in a single payment or transfer, in installments, or on a deferred basis. The Committee may make rules relating to installment or deferred payments with respect to Awards, including the rate of interest to be credited with respect to such payments.

(d)     *Buyouts.*  The Committee may at any time offer to buy out any outstanding Award for a payment in cash, Stock, other Awards (subject to Section 7(a)), or other property based on such terms and conditions as the Committee shall determine.

(e)     *Cancellation and Rescission of Awards.*  The Committee may provide in any Award Agreement that, in the event a Participant violates a term of the Award Agreement or other agreement with or policy of the Company or a Subsidiary or Affiliate, takes or omits to take actions that are deemed to be in competition with the Company or its Subsidiaries or Affiliates, an unauthorized solicitation of customers, suppliers, or employees of the Company or its Subsidiaries or Affiliates, or an unauthorized disclosure or misuse of proprietary or confidential information of the Company or its Subsidiaries or Affiliates, or takes or omits to take any other action as may be specified in the Award Agreement, the Participant shall be subject to forfeiture of such Award or portion, if any, of the Award as may then remain outstanding and also to forfeiture of any amounts of cash, Stock, other Awards, or other property received by the Participant upon exercise or settlement of such Award or in connection with such Award during such period (as the Committee may provide in the Award Agreement) prior to the occurrence which gives rise to the forfeiture.

(f)     *Awards to Participants Outside the United States.*  The Committee may modify the terms of any Award under the Plan granted to a Participant who is, at the time of grant or during the term of the Award, resident or primarily employed outside of the United States in any manner deemed by the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then resident or primarily employed, or so that the value and other benefits of the Award to the Participant, as affected by foreign tax laws and other restrictions applicable as a result of the Participant's residence or employment abroad, shall be comparable to the value of such an Award to a Participant who is resident or primarily employed in the United States. An Award may be modified under this Section 7(f) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation.

8.     *Performance Awards.*  The right of a Participant to exercise or receive a grant or settlement of any Award, and the timing thereof, may be subject to such performance conditions as may be specified by the Committee. The Committee may use such business

- 10 -

criteria and other measures of performance as it may deem appropriate in establishing any performance conditions, and may exercise its discretion to reduce or increase the amounts payable under any Award subject to performance conditions. Achievement of performance goals in respect of such Performance Awards shall be measured over a performance period specified by the Committee. Settlement of such Performance Awards shall be in cash, Stock, other Awards, or other property, in the discretion of the Committee. The Committee shall specify the circumstances in which such Performance Awards shall be forfeited in the event of termination of employment by the Participant prior to the end of a performance period or settlement of Performance Awards, and other terms relating to such Performance Awards in accordance with Section 6 and this Section 8.

9.     *Change in Control Provisions.*

(a)     *Acceleration Upon Change in Control.* Except as provided in Section 9(e) or in an Award Agreement, in the event of a "Change in Control," as defined in this Section:

(i)     any Award carrying a right to exercise that was not previously exercisable and vested shall become fully exercisable and vested; and

(ii)     the restrictions, deferral limitations, and forfeiture conditions applicable to any other Award granted under the Plan shall lapse, such Awards shall be deemed fully vested, any performance conditions imposed with respect to Awards shall be deemed to be fully achieved, and payment of such Awards shall be made in accordance with the terms of the Award Agreements.

(b)     *"Change in Control" Defined.* For purposes of the Plan, a "Change in Control" shall have occurred if:

(i)     any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company or any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding voting securities;

(ii)     during any period of two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (i), (iii), or (iv) of this Section 9(b)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(iii)    the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or parent entity) 50% or more of the combined voting power of the voting securities of the Company or such surviving or parent entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as hereinabove defined) acquired 50% or more of the combined voting power of the Company's then outstanding securities; or

(iv)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets (or any transaction having a similar effect).

(c)    *"Change in Control Price" Defined.*  For purposes of the Plan, "Change in Control Price" means the higher of (i) the highest price per share paid in any transaction constituting a Change in Control or (ii) the highest Fair Market Value per share at any time during the 60-day period preceding or following a Change in Control.

(d)    *Additional Payments.*  If any payment attributable to any Award under the Plan or to any award under the Preexisting Plan and Share Resolutions (the "Payments") will be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code (or any similar tax that may hereafter be imposed), the Company shall pay at the time specified below an additional amount (the "Gross-Up Payment") such that the net amount retained by a Participant after deduction of any Excise Tax on such Payments and any federal, state and local income and employment tax and Excise Tax upon the payment provided for by this Section, shall be equal to the Payments. For purposes of determining whether any of the Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all payments or benefits received or to be received by a Participant in connection with a Change in Control of the Company or the Participant's termination of employment with the Company, a parent corporation thereof, a Subsidiary or Affiliate (pursuant to the Plan or any other plan, agreement or arrangement of the Company, its Subsidiaries or Affiliates) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) shall be treated as subject to the Excise Tax, unless in the opinion of tax counsel selected by the Company's independent auditors and acceptable to the Participant such payments or benefits (in whole or in part) do not constitute parachute payments, or such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered within the meaning of Section 280G(b)(4) of the Code in excess of the base amount within the meaning of Section 280G(b)(3) of the Code, or are otherwise not subject to the Excise Tax; (ii) the amount of the Payments which shall be treated as subject to the Excise Tax shall be equal to the lesser of (1) the total amount of the Payments or (2) the amount of excess parachute payments within the meaning of Section 280G(b)(1) (after applying clause (i) above); and (iii) the value of any non-cash benefits or any deferred payment or benefit shall be determined by the Company's independent auditors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code. For purposes of determining the amount of the Gross-Up Payment, the Participant shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up

Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Participant's residence on the date such Gross-Up Payment is made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes. In the event that the Excise Tax is subsequently determined to be less than the amount taken into account hereunder at the time of the Gross-Up Payment, the Participant shall repay to the Company at the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus the portion of the Gross-Up Payment attributable to the Excise Tax and federal and state and local income tax imposed on the Gross-Up Payment being repaid by the Participant if such repayment results in a reduction in Excise Tax and/or a federal and state and local income tax deduction) plus interest on the amount of such repayment at the rate provided in Section 1274(b)(2)(B) of the Code. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (plus any interest payable with respect to such excess) at the time that the amount of such excess is finally determined. Any Gross-Up Payment to be made to the Participant under this paragraph shall be payable within thirty (30) days of the date of the Change in Control.

(e)    *Pooling of Interests*. Notwithstanding the provisions of this Section 9, in the event that consummation of a Change in Control is contingent on the ability to account for such Change in Control under "pooling of interests" accounting methodology, the provisions of Sections 9(a) and 9(d) hereof shall not be implemented to the extent such implementation would prevent the Change in Control transaction from being accounted for in such manner. In such event, the Committee may in its discretion take such action as it deems appropriate, without precluding the Change in Control transaction from being so accounted for, to enable holders of Awards to realize substantially similar economic results as would have been realized through application of Sections 9(a) and 9(d) hereof.

10.    **General Provisions.**

(a)    *Compliance with Legal and Exchange Requirements*. The Plan, the granting and exercising of Awards thereunder, and the other obligations of the Company under the Plan and any Award Agreement, shall be subject to all applicable federal and state laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required. The Company, in its discretion, may postpone the issuance or delivery of Stock under any Award until completion of such stock exchange listing or registration or qualification of such Stock or other required action under any state, federal or foreign law, rule or regulation as the Company may consider appropriate, and may require any Participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of Stock in compliance with applicable laws, rules and regulations.

(b)    *Nontransferability*. Except as otherwise provided in this Section 10(b), Awards shall not be transferable by a Participant other than by will or the laws of descent and distribution or pursuant to a designation of a Beneficiary, and Awards shall be exercisable during the lifetime of a Participant only by such Participant or his guardian or legal representative. In addition, except as otherwise provided in this Section 10(b), no rights under

- 13 -

# EXHIBIT C -3

the Plan may be pledged, mortgaged, hypothecated, or otherwise encumbered, or subject to the claims of creditors. The foregoing notwithstanding, the Committee may, in its sole discretion, provide that Awards (or rights or interests therein) shall be transferable, including permitting transfers, without consideration, to a Participant's immediate family members (i.e., spouse, children, grandchildren, or siblings, as well as the Participant), to trusts for the benefit of such immediate family members, and to partnerships in which such family members are the only parties, or other transfers deemed by the Committee to be not inconsistent with the purposes of the Plan.

(c)    *No Right to Continued Employment.*  Neither the Plan nor any action taken thereunder shall be construed as giving any employee the right to be retained in the employ of the Company or any of its Subsidiaries or Affiliates, nor shall it interfere in any way with the right of the Company or any of its Subsidiaries or Affiliates to terminate any employee's employment at any time.

(d)    *Taxes.*  The Company or any Subsidiary or Affiliate is authorized to withhold from any Award granted, any payment relating to an Award under the Plan, including from a distribution of Stock, or any payroll or other payment to a Participant, amounts of withholding and other taxes due in connection with any transaction involving an Award, and to take such other action as the Committee may deem advisable to enable the Company and Participants to satisfy obligations for the payment of withholding taxes and other tax obligations relating to any Award. This authority shall include authority to withhold or receive Stock or other property and to make cash payments in respect thereof in satisfaction of a Participant's tax obligations. Other provisions of the Plan notwithstanding, only the minimum amount of Stock deliverable in connection with an Award necessary to satisfy statutory withholding requirements will be withheld.

(e)    *Changes to the Plan and Awards.*  The Board may amend, alter, suspend, discontinue, or terminate the Plan or the Committee's authority to grant Awards under the Plan; provided, however, that, without the consent of an affected Participant, no amendment, alteration, suspension, discontinuation, or termination of the Plan may materially adversely affect the rights of such Participant under any Award theretofore granted to him or her. The Committee may waive any conditions or rights under, or amend, alter, suspend, discontinue, or terminate any Award theretofore granted and any Award Agreement relating thereto; provided, however, that, without the consent of an affected Participant, no such amendment, alteration, suspension, discontinuation, or termination of any Award may materially adversely affect the rights of such Participant under such Award. Following the occurrence of a Change in Control, the Board may not terminate this Plan or amend this Plan with respect to Awards that have already been granted in any manner adverse to employees.

(f)    *No Rights to Awards; No Stockholder Rights.*  No Participant or employee shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants and employees. No Award shall confer on any Participant any of the rights of a stockholder of the Company unless and until Stock is duly issued or transferred to the Participant in accordance with the terms of the Award.

(g)    *Unfunded Status of Awards and Trusts.*  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payments not

yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Committee may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan to deliver cash, Stock, other Awards, or other property pursuant to any Award, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Committee otherwise determines.  If and to the extent authorized by the Committee, the Company may deposit into such a trust Stock or other assets for delivery to the Participant in satisfaction of the Company's obligations under any Award.  If so provided by the Committee, upon such a deposit of Stock or other assets for the benefit of a Participant, there shall be substituted for the rights of the Participant to receive delivery of Stock and other payments under this Plan a right to receive the assets of the trust (to the extent that the deposited Stock or other assets represented the full amount of the Company's obligation under the Award at the date of deposit).  The trustee of the trust may be authorized to dispose of trust assets and reinvest the proceeds in alternative investments, subject to such terms and conditions as the Committee may specify and in accordance with applicable law.

(h)     *Nonexclusivity of the Plan.*  The adoption of the Plan by the Board shall not be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including the granting of stock options and other awards otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(i)     *No Fractional Shares.*  No fractional shares of Stock shall be issued or delivered pursuant to the Plan or any Award.  The Committee shall determine whether cash, other Awards, or other property shall be issued or paid in lieu of such fractional shares or whether such fractional shares or any rights thereto shall be forfeited or otherwise eliminated.

(j)     *Governing Law.*  The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of laws, and applicable federal law.

(k)     *Effective Date.*  The Plan shall become effective upon approval by the Board of Directors (the "Effective Date").

(l)     *Titles and Headings; Certain Terms.*  The titles and headings of the sections in the Plan are for convenience of reference only.  In the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.  The term "including," when used in the Plan, means in each case "including without limitation."



Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

April 9, 2004

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providence, NJ 07974

Dear Jeffrey:

I am pleased to confirm the award to you of 2,803 Stock Bonus Units under the MMC
2000 Employee Incentive and Stock Award Plan. This award was granted on March 1, 2004,
with a fair market value of $48.1700 per share. The award is subject to the attached terms and
conditions, and vests fully to you on the earlier of (1) March 1, 2007 or (2) your retirement
date.

You will receive a dividend equivalent payment on the stock bonus units each time a dividend
is paid on MMC common stock. This payment will be included in your payroll check. When
the units vest, you will receive one share of MMC common stock for each unit granted.

This grant is intended to align your financial interest with those of our shareholders and to provide
you with an opportunity to benefit from the long term growth and profitability of MMC. The award
also demonstrates our confidence in your future contributions to the continued success of the company.

Sincerely,

Enclosures
CATS System.DSUGntLet

Marsh · Putnam · Mercer
Marsh & McLennan Companies

**MMC**

Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

April 9, 2004

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providence, NJ 07974

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the MMC Board of Directors has granted you a nonqualified stock option, effective March 17, 2004, to acquire 2,590 shares of Marsh & McLennan Companies common stock at an exercise price of US$46.14 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 16, 2004.

Subject to the provisions of the MMC 2000 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 16, 2014. The option will vest in 25% increments each year beginning on March 17, 2005 and will be fully exercisable as of March 17, 2008. The continued vesting and exercisability of the options are subject to the status of your employment.

The enclosed materials, including the terms and conditions of the March 17, 2004 grant and a copy of the plan document, provide more detailed information. You should consult your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interest with those of our shareholders. Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures
CATS System SoGenLet



Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

April 10, 2003

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providenc, NJ 07974

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the MMC Board of Directors has granted you a nonqualified stock option, effective March 20, 2003, to acquire 3,000 shares of Marsh & McLennan Companies common stock at an exercise price of US$42.99 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 19, 2003.

Subject to the provisions of the MMC 2000 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 19, 2013. The option on 25% of the shares may be exercised beginning on or after March 20, 2004. The remainder of the grant will vest in 25% increments each year thereafter so that the option will be 100% exercisable as of March 20, 2007. The continued vesting and exercisability of the options are also subject to the status of your employment. The enclosed materials, including the Terms and Conditions of the March 20, 2003 grant and a copy of the plan document, provide more detailed information. You should consult with your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interest with those of our shareholders. Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures
CATS System SoGenLet

Marsh • Putnam • Mercer
Marsh & McLennan Companies

5916552MARGB/B68001



Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

March 25, 2003

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providenc, NJ 07974

Dear Jeffrey:

I am pleased to confirm that the Compensation Committee of the MMC Board of Directors
has approved the recommendation of management to award you 605 stock bonus units
under the MMC 2000 Employee Incentive and Stock Award Plan. This award was
granted on February 28, 2003 and, subject to the attached Terms and Conditions, vests
fully to you on the earlier of (1) February 28, 2006 or (2) your retirement date.

You will receive dividend equivalent payments on the stock bonus units, paid each time a
dividend is paid on MMC common stock. These payments will be included in your payroll
checks. When the units vest, you will receive one share of MMC common stock for each unit
you have been granted.

This grant is intended to align your financial interest with those of our shareholders and to provide
you with an opportunity to benefit from the long term growth and profitability of MMC. The award
demonstrates our confidence in your future contributions to the continued success of the company.

Sincerely,

Enclosures
CATS System:DSUGntLet

# MARSH

Jeffrey R. Lattmann

## MARSH INC. 2003 ANNUAL BONUS WORKSHEET

**2003 Bonus Award**

| | | |
|---|---|---|
| Annual Bonus: | $ | 170,000 |
| Less Bonus Amount in Stock Bonus Units (SBUs): | ($ | 60,000) |
| **Bonus Amount in Cash:** | **$** | **110,000** |
| Additional One-Time SBU Award: | $ | 75,000 |
| **Total Stock Bonus Units (SBUs):** | **$** | **135,000** |

**Stock Bonus Unit Calculation**

Your 2003 bonus is comprised of a combination of cash and stock bonus units (SBUs). Stock bonus units are ultimately paid out in the form of MMC shares. The vesting date for the SBUs granted in connection with your 2003 bonus is three years from the date of grant, or March 1, 2007. SBUs earn quarterly dividend equivalents, which will be included in your payroll check.

To determine the number of shares awarded, the dollar amount of the SBU portion is divided by the average of the high and low selling prices of MMC shares as traded on the New York Stock Exchange on February 27, 2004.

You will receive a package with more detailed information regarding your grant of SBUs in the near future. Please refer to it for complete plan information.

**Additional One-Time SBU Award**

Additional one-time SBU awards were approved for the 2003 bonus year. These SBUs vest on March 1, 2007. This grant is separate and distinct from your annual bonus and should not be considered as a recurring event.



Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

April 10, 2002

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providence, NJ 07974

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the MMC Board of Directors has granted you a nonqualified stock option, effective March 21, 2002, to acquire 2,000 shares of Marsh & McLennan Companies common stock at an exercise price of US$112.00 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 20, 2002.

Subject to the provisions of the MMC 2000 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 20, 2012. The option on 25% of the shares may be exercised beginning on or after March 21, 2003. The remainder of the grant will vest in 25% increments each year thereafter so that the option will be 100% exercisable as of March 21, 2006. The continued vesting and exercisability of the options are also subject to the status of your employment. The enclosed materials, including the Terms and Conditions of the March 21, 2002 grant and a copy of the plan document, provide more detailed information. You should consult with your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interest with those of our shareholders. Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures
CATS System SoGntLet

Marsh · Putnam · Mercer
Marsh & McLennan Companies

Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6123

# MMC

July 23, 2001

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providenc, NJ 07974

Dear Jeffrey:

I am pleased to confirm that the Compensation Committee of the MMC Board of Directors
has approved the recommendation of management to award you 996 deferred stock units
under the MMC 2000 Employee Incentive and Stock Award Plan. This award was
granted on July 18, 2001 and, subject to the attached Terms and Conditions, vests
fully to you on the earlier of (1) July 18, 2004 or (2) the later of your normal or deferred
retirement date.

You will receive dividend equivalent payments on the deferred stock units, paid each time a
dividend is paid on MMC common stock. These payments will be included in your payroll
checks. When the units vest, you will receive one share of MMC common stock for each unit
you have been granted.

This grant is intended to align your financial interest with those of our shareholders and to provide
you with an opportunity to benefit from the long term growth and profitability of MMC. The award
demonstrates our confidence in your future contributions to the continued success of the company.

Sincerely,

Enclosures
CATS System:DSUGrtLet

Marsh · Putnam · Mercer
The MMC Companies



Jeffrey W. Greenberg
Chairman

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6123

April 25, 2001

Mr. Jeffrey R. Lattmann
166 Woodbine Circle
New Providence, NJ 07974

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the MMC Board of Directors has granted you a nonqualified stock option, effective March 15, 2001, to acquire 1,500 shares of Marsh & McLennan Companies common stock at an exercise price of US$92.20 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 14, 2001.

Subject to the provisions of the MMC 2000 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 14, 2011. The option on 25% of the shares may be exercised beginning on or after March 15, 2002. The remainder of the grant will vest in 25% increments each year thereafter so that the option will be 100% exercisable as of March 15, 2005. The continued vesting and exercisability of the options are also subject to the status of your employment. The enclosed materials, including the Terms and Conditions of the March 15, 2001 grant and a copy of the plan document, provide more detailed information. You should consult with your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interest with those of our shareholders. Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures
CATS System SoGmtLet

Marsh · Putnam · Mercer
The MMC Companies

Jeffrey W. Greenberg
President

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6125



April 28, 2000

Mr. Jeffrey R. Lattmann
72 Woodland Avenue
Allendale, NJ 07401

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the Board of Directors has granted you a nonqualified stock option, effective March 16, 2000, to acquire 1,450 shares of Marsh & McLennan Companies common stock at an exercise price of US$ 87.250000 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 15, 2000.

Subject to the provisions of the MMC 1997 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 15, 2010. The option on 25% of the shares may be exercised beginning on or after March 16, 2001. The remainder of the grant will vest in 25% increments each year thereafter so that the option will be 100% exercisable as of March 16, 2004. The continued vesting and exercisability of the options are also subject to the status of your employment. The enclosed materials, including the Terms and Conditions of the March 16, 2000 grant and a copy of the plan document, provide more detailed information. You should consult with your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interest with those of our shareholders. Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures

CATS System:SoGntLet

Marsh · Putnam · Mercer
The MMC Companies

A. J. C. Smith
Chairman of the Board

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 5113

April 30, 1999

# MARSH & McLENNAN COMPANIES

Mr. Jeffrey R. Lattmann
72 Woodland Avenue
Allendale  NJ 07401

Dear Jeffrey:

I am pleased to inform you that, based on the recommendation of management, the Compensation Committee of the Board of Directors has granted you a nonqualified stock option, effective March 18, 1999, to acquire 1,400 shares of Marsh & McLennan Companies common stock at an exercise price of US$75.53125 per share, the average of the high and low prices of MMC shares traded on the New York Stock Exchange on March 17, 1999.

Subject to the provisions of the MMC 1997 Employee Incentive and Stock Award Plan, this is a ten-year option expiring on March 17, 2009.  The option on 25% of the shares may be exercised beginning on or after March 18, 2000.  The remainder of the grant will vest in 25% increments each March 18 thereafter so that the option will be 100% exercisable as of March 18, 2003.  The continued vesting and exercisability of the options are also subject to the status of your employment.  The enclosed materials, including the Terms and Conditions of the March 18, 1999 grants and a copy of the plan document, provide more detailed information.  You should consult with your personal tax advisor about the tax implications of exercising the option.

This grant is intended to align your financial interests with those of our shareholders.  Additionally, your selection as an award recipient provides you with an opportunity to benefit from the long-term growth and profitability of MMC.

Sincerely,

Enclosures
vloptmrgltrd

The parent ,
risk and insu
management .

**MMC**

Thomas M. Sansone
Vice President
Global Human Resources

March & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
212 345 5580 Fax 212 827 9777
thomas.m.sansone@mmc.com

May 19, 2004

Dear MMC Stock Option and Restricted Share Holder:

I am pleased to enclose your **2004 Reports of Stock Options and Restricted Shares.**

These reports reflect your MMC stock options and restricted shares as of March 31, 2004. They are prepared annually, as of the end of the first quarter, which is the quarter when awards typically are granted.

With respect to report format, the front side of each report includes information on grants, exercises and vesting dates, while the reverse side provides an explanation of the report headings.

Should you have any questions, please contact Jon Schwarzbach at 212-345-5542 or Kelly Gamble at 212-948-3523.

Sincerely,

*Thomas M. Sansone*

Enclosures
*memo-so&rs2004*

**MMC**

# Report of Restricted Shares as of March 31, 2004

## FOR STEVEN H. ANDERSON

ID: 577861

| Grants | | | | | Exchanges | | Distribution of Vested Shares | | | Undistributed Shares | | | Scheduled Distribution | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Type | Vesting Date | # Shares | Share Value($) | Date | # Shares | Date | # Shares | Share Value($) | # Vested | # Unvested | Total | Date | # Installments |
| 03/01/2004 | SBU | 03/01/2007 | 3,374 | 162,526 | | | | | | | 3,374 | 3,374 | 03/01/2007 | 1 |
| 04/15/2003 | DSU | 05/15/2006 | 4,104 | 200,029 | | | | | | | 4,104 | 4,104 | 05/15/2006 | 1 |
| 02/28/2003 | SBU | 02/28/2006 | 2,419 | 100,026 | | | | | | | 2,419 | 2,419 | 02/28/2006 | 1 |
| 06/27/2002 | DSU | 06/27/2005 | 6,426 | 300,014 | | | | | | | 6,426 | 6,426 | 06/27/2005 | 1 |
| 03/01/2002 | SBU | 03/01/2005 | 1,076 | 57,520 | | | | | | | 1,076 | 1,076 | 03/01/2005 | 1 |
| 03/01/2001 | SBU | 03/01/2004 | 834 | 45,057 | | | 03/01/2004 | 834 | 40,174 | | | | | |
| 03/15/2000 | SBU | 03/15/2003 | 1,018 | 40,036 | | | 03/15/2003 | 1,018 | 41,901 | | | | | |
| 02/26/1999 | SBU | 02/26/2002 | 1,164 | 40,031 | | | 02/26/2002 | 1,164 | 61,139 | | | | | |
| 03/13/1998 | SBU | 03/13/2001 | 1,324 | 40,106 | | | 03/13/2001 | 1,324 | 64,267 | | | | | |
| 12/12/1997 | DSU | 12/12/2000 | 8,542 | 215,063 | | | 12/12/2000 | 8,542 | 538,680 | | | | | |
| 02/24/1995 | DSU | 02/24/1998 | 5,724 | 80,017 | | | 02/24/1998 | 5,724 | 162,657 | | | | | |
| | | | 36,005 | 1,280,425 | | | | 18,606 | 908,818 | | 17,399 | 17,399 | | |

**MMC**

# Report of Stock Options as of March 31, 2004

## FOR STEVEN H. ANDERSON

EMPLID: 577861

| Grants | | | | Exercises, Exchanges and Forfeitures | | | | Outstanding | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Type | Share Price($) | # Shares | Date | Type | Share Price($) | # Shares | # Vested Shares | # Unvested Shares | Expiration Date |
| 03/17/2004 | NSO | 46.140000 | 6,070 | | | | | | 6,070 | 03/16/2014 |
| 03/20/2003 | NSO | 42.990000 | 8,000 | | | | | 2,000 | 6,000 | 03/19/2013 |
| 07/18/2002 | NSO | 42.900000 | 20,000 | | | | | 5,000 | 15,000 | 07/17/2012 |
| 03/21/2002 | NSO | 56.000000 | 8,000 | | | | | 4,000 | 4,000 | 03/20/2012 |
| 03/15/2001 | NSO | 46.100000 | 8,000 | | | | | 6,000 | 2,000 | 03/14/2011 |
| 03/16/2000 | NSO | 43.625000 | 9,000 | | | | | 9,000 | | 03/15/2010 |
| 03/18/1999 | NSO | 37.765625 | 10,000 | | | | | 10,000 | | 03/17/2009 |
| 03/19/1998 | NSO | 30.125000 | 7,500 | | | | | 7,500 | | 03/18/2008 |
| 03/21/1996 | NSO | 15.843750 | 4,800 | | | | | 4,800 | | 03/20/2006 |
| 05/16/1995 | NSO | 13.093750 | 6,000 | 11/13/2003 | EXER | 45.035000 | 6,000 | | | |
| 03/16/1993 | NSO | 15.604167 | 8,220 | 03/11/2003 | EXER | 38.745000 | 8,220 | | | |
| 09/21/1992 | NSO | 14.052084 | 9,000 | 09/16/2002 | EXER | 45.885000 | 9,000 | | | |
| 03/17/1992 | NSO | 12.312500 | 6,000 | 03/11/2002 | EXER | 54.592500 | 6,000 | | | |
| | | | 110,590 | | | | 29,220 | 48,300 | 33,070 | |

**MMC**

# Report of Restricted Shares as of March 31, 2004

FOR JACK S. FLUG

ID: 579746

| Grants | | | | | Exchanges | | Distribution of Vested Shares | | | Undistributed Shares | | | Scheduled Distribution | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Type | Vesting Date | # Shares | Share Value($) | Date | # Shares | Date | # Shares | Share Value($) | # Vested | # Unvested | Total | Date | # installments |
| 03/01/2004 | SBU | 03/01/2007 | 2,284 | 110,020 | | | | | | | 2,284 | 2,284 | 03/01/2007 | 1 |
| 02/28/2003 | SBU | 02/28/2006 | 1,935 | 80,012 | | | | | | | 1,935 | 1,935 | 02/28/2006 | 1 |
| 06/27/2002 | DSU | 06/27/2005 | 5,355 | 250,012 | | | | | | | 5,355 | 5,355 | 06/27/2005 | 1 |
| 03/01/2002 | SBU | 03/01/2005 | 702 | 37,527 | | | | | | | 702 | 702 | 03/01/2005 | 1 |
| 03/01/2001 | SBU | 03/01/2004 | 556 | 30,038 | | | 03/01/2004 | 556 | 26,783 | | | | | |
| 03/16/2000 | DSU | 03/16/2003 | 4,586 | 200,064 | | | 03/16/2003 | 4,586 | 188,760 | | | | | |
| 03/15/2000 | SBU | 03/15/2003 | 382 | 15,023 | | | 03/15/2003 | 382 | 15,723 | | | | | |
| | | | 15,800 | 722,696 | | | | 5,524 | 231,266 | | 10,276 | 10,276 | | |



# Report of Stock Options as of March 31, 2004

FOR JACK S. FLUG

EMPLID: 579746

| Grants | | | | Exercises, Exchanges and Forfeitures | | | | Outstanding | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Type | Share Price($) | # Shares | Date | Type | Share Price($) | # Shares | # Vested Shares | # Unvested Shares | Expiration Date |
| 03/17/2004 | NSO | 46.140000 | 5,670 | | | | | | 5,670 | 03/16/2014 |
| 03/20/2003 | NSO | 42.990000 | 7,000 | | | | | 1,750 | 5,250 | 03/19/2013 |
| 07/18/2002 | NSO | 42.900000 | 20,000 | | | | | 5,000 | 15,000 | 07/17/2012 |
| 03/21/2002 | NSO | 56.000000 | 7,000 | | | | | 3,500 | 3,500 | 03/20/2012 |
| 03/15/2001 | NSO | 46.100000 | 7,000 | | | | | 5,250 | 1,750 | 03/14/2011 |
| 03/16/2000 | NSO | 43.625000 | 4,500 | | | | | 4,500 | | 03/15/2010 |
| 03/18/1999 | NSO | 37.765625 | 5,000 | | | | | 5,000 | | 03/17/2009 |
| 03/19/1998 | NSO | 30.125000 | 4,800 | | | | | 4,800 | | 03/18/2008 |
| 03/20/1997 | NSO | 20.635417 | 12,000 | 12/19/2003 | EXER | 45.540000 | 3,000 | 6,000 | | 03/19/2007 |
| | | | | 01/27/2000 | EXER | 50.406250 | 3,000 | | | |
| 03/21/1996 | NSO | 15.843750 | 4,200 | 12/19/2003 | EXER | 45.540000 | 1,100 | | | |
| | | | | 07/17/2000 | EXER | 54.843750 | 1,000 | | | |
| | | | | 02/19/1999 | EXER | 33.437500 | 2,100 | | | |
| | | | 77,170 | | | | 10,200 | 35,800 | 31,170 | |

# % Total Compensation

|  | 2004 | 2003 |
|---|---|---|
| Your annual base salary as of January 1 is .................$ | 325,000 | $ 325,000 |
| On the basis of your annual base salary, the value of the benefits to which the Company contributes is estimated to be ........................................................$ | 36,551 | $ 39,096 |
| In addition, you received the following other compensation for the year prior to that shown: | | |
| Stock Investment Plan Company Contribution .....$ | 7,510 | $ 8,459 |
| Stock Investment Supplemental Plan Company Contribution ................................................$ | 3,262 | $ -0- |
| Stock Purchase Plan Gain .....................................$ | 7,222 | $ 3,241 |
| **Bonus Award** ...................................................$ | 270,000 | $ 210,000 |
| - Cash Portion .........................$ 160,000 | | |
| - 2,284 Stock Bonus Units .......$ 110,000 | | |
| Your Total Estimated Annual Compensation .............$ | 649,545 | $ 585,796 |

### Compensation as of 1/1/2004



Annual Base Salary 50.0%

Investment Program 2.8%

Cost of Other Benefits 5.6%

Bonus Award 41.6%



# $ Flexible Spending Account (FSA)

You may make before-tax payroll contributions to an FSA to pay for qualified health care or dependent care expenses.

**Health Care Spending Account**
You are not participating in this account.

**Dependent Care Spending Account**
You are not participating in this account.