UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                                        :
STEVEN H. ANDERSON, JACK S. FLUG,                       :
and JEFFREY R. LATTMANN,                                :

                Plaintiffs,      :    08 Civ. 2378 (DAB)

      - against -                               :    AMENDED ANSWER TO
                                                        :    AMENDED COMPLAINT
MARSH & MCLENNAN COMPANIES,                             :    AND COUNTERCLAIMS
INC., MARSH USA INC., and                               :
DOES 1 through 50, inclusive,                           :    **Jury Trial Demanded**

                Defendants.      :

———————————————————————— x

      Defendants Marsh & McLennan Companies, Inc. ("MMC") and Marsh USA Inc. ("Marsh") (collectively, "defendants"), by and through their attorneys, Winston & Strawn LLP, answer the amended complaint as follows:

      1.      State that the allegations contained in paragraph 1 are prefatory and do not require a response.

      2.      Deny the allegations contained in paragraph 2, except admit that plaintiffs purport to bring various contract claims against defendants.

      3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3.

      4.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4.

      5.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5.

6.      Deny the allegations contained in paragraph 6, except admit that MMC is a global professional services firm with offices at 1166 Avenue of the Americas, New York, New York 10036.

7.      Deny the allegations contained in paragraph 7, except admit that Marsh is a risk and insurance services subsidiary of MMC with offices at 1166 Avenue of the Americas, New York, New York 10036.

8.      Deny the allegations contained in paragraph 8.

9.      State that the allegations contained in paragraph 9 consist of legal conclusions as to which no response is required and otherwise deny the allegations contained in that paragraph, except admit that MMC and Marsh transact business in New York.

10.     Deny the allegations contained in paragraph 10, except admit that plaintiff Steven H. Anderson ("Anderson") was an employee of Marsh from in or about August 1989 through on or about December 30, 2004.

11.     Deny the allegations contained in paragraph 11.

12.     Deny the allegations contained in paragraph 12, except admit that plaintiff Jack S. Flug ("Flug") was an employee of Marsh from in or about March 1995 through on or about December 30, 2004.

13.     Deny the allegations contained in paragraph 13, except admit that plaintiff Jeffrey R. Lattmann ("Lattmann") was an employee of Marsh from in or about 1990 through on or about December 30, 2004.

14.     Deny the allegations contained in paragraph 14, except admit that Anderson communicated that he was considering an offer from AON, and that George Mikes ("Mikes") communicated with Anderson concerning Anderson's remaining with Marsh.

2

15.    Deny the allegations contained in paragraph 15, except admit that Flug communicated that he was considering an offer from AON.

16.    Deny the allegations contained in paragraph 16, except admit that on or about October 14, 2004, then New York Attorney General Eliot Spitzer commenced an action against MMC, and respectfully refer the Court to the complaint in that action for the contents thereof.

17.    Deny the allegations contained in paragraph 17.

18.    Deny the allegations contained in paragraph 18, and respectfully refer the Court to the writing from Michael Cherkasky ("Cherkasky") to Anderson, dated November 18, 2004, for the contents thereof.

19.    Deny the allegations contained in paragraph 19, and respectfully refer the Court to the writing from Cherkasky to Flug, dated November 18, 2004, for the contents thereof.

20.    Deny the allegations contained in paragraph 20, and respectfully refer the Court to the writing from Cherkasky to Lattmann, dated November 18, 2004, for the contents thereof.

21.    Deny the allegations contained in paragraph 21.

22.    Deny the allegations contained in paragraph 22, except admit that Mikes and Anderson had one or more communications in December 2004 concerning Anderson's future plans.

23.    Deny the allegations contained in paragraph 23.

24.    Deny the allegations contained in paragraph 24, except admit that Marsh employees owe duties of loyalty to Marsh.

25.    Deny the allegations contained in paragraph 25, except deny knowledge or information sufficient to form a belief as to plaintiffs' alleged communications with unidentified "senior employees."

26.    Deny the allegations contained in paragraph 26.

27.    Deny the allegations contained in paragraph 27, except admit that Dean Klisura and Lattmann had one or more communications in December 2004.

28.    Deny the allegations contained in paragraph 28.

29.    Deny the allegations contained in paragraph 29, except admit that Mikes and Flug had one or more communications in December 2004.

30.    Deny the allegations contained in paragraph 30, except admit that Mikes and Pamela Harrison ("Harrison") communicated with Flug on or about December 30, 2004, and that Mikes communicated to Flug that Flug's employment with Marsh was terminated.

31.    Deny the allegations contained in paragraph 31, except admit that, on or about December 30, 2004, Mikes communicated to Anderson that Anderson's employment with Marsh was terminated.

32.    Deny the allegations contained in paragraph 32, except admit that, on or about December 30, 2004, Mikes communicated to Lattmann that Lattmann's employment with Marsh was terminated.

33.    Deny the allegations contained in paragraph 33, except admit that Harrison spoke with each plaintiff and confirmed that his employment with Marsh was terminated for cause.

34.    Deny the allegations contained in paragraph 34, except admit that Marsh wrote to plaintiffs in or about late December 2004, and respectfully refer the Court to such writings for the contents thereof.

35.    Deny the allegations contained in paragraph 35.

36.    Deny the allegations contained in paragraph 36.

37.    Deny the allegations contained in paragraph 37.

4

38.     Deny the allegations contained in paragraph 38.

39.     Deny the allegations contained in paragraph 39.

40.     Deny the allegations contained in paragraph 40.

41.     Deny the allegations contained in paragraph 41.

42.     Deny the allegations contained in paragraph 42, except admit that plaintiffs, like other Marsh employees, were eligible for periodic compensation reviews.

43.     Deny the allegations contained in paragraph 43.

44.     Deny the allegations contained in paragraph 44, except admit that, inasmuch as the terminations of their employment with Marsh were for cause, plaintiffs were not eligible for the benefits to which they now allege entitlement.

45.     Deny the allegations contained in paragraph 45, and respectfully refer the Court to the applicable severance plan for the contents thereof.

46.     Deny the allegations contained in paragraph 46.

47.     Deny the allegations contained in paragraph 47.

48.     Deny the allegations contained in paragraph 48.

49.     Deny the allegations contained in paragraph 49.

50.     Repeat and reallege paragraphs 1 through 49 above as if fully set forth herein.

51.     Deny the allegations contained in paragraph 51, except admit that plaintiffs entered into certain agreements with MMC, and respectfully refer the Court to such agreements for the contents thereof.

52.     Deny the allegations contained in paragraph 52.

53.     Deny the allegations contained in paragraph 53.

54.     Repeat and reallege paragraphs 1 through 53 above as if fully set forth herein.

55.    Deny the allegations contained in paragraph 55.

56.    Deny the allegations contained in paragraph 56.

57.    Repeat and reallege paragraphs 1 through 56 above as if fully set forth herein.

58.    Deny the allegations contained in paragraph 58, and respectfully refer the Court to the applicable severance plan for the contents thereof.

59.    Deny the allegations contained in paragraph 59.

60.    Deny the allegations contained in paragraph 60.

61.    Deny the allegations contained in paragraph 61.

62.    Repeat and reallege paragraphs 1 through 61 above as if fully set forth herein.

63.    Deny the allegations contained in paragraph 63.

64.    Deny the allegations contained in paragraph 64.

65.    Deny the allegations contained in Paragraph 65.

<u>FIRST AFFIRMATIVE DEFENSE</u>

66.    The amended complaint, in whole or in part, fails to state a claim upon which relief may be granted.

<u>SECOND AFFIRMATIVE DEFENSE</u>

67.    The claims set forth in the amended complaint are barred, in whole or in part, by each plaintiff's failure to exhaust the administrative remedies set forth in the applicable severance plan.

<u>THIRD AFFIRMATIVE DEFENSE</u>

68.    The claims set forth in the amended complaint are barred, in whole or in part, by the equitable doctrines of unclean hands, waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

69.    The claims set forth in the amended complaint are barred, in whole or in part, by recoupment.

## FIFTH AFFIRMATIVE DEFENSE

70.    The claims set forth in the amended complaint are barred, in whole or in part, by evidence acquired by Marsh following the termination of plaintiffs' employment that, during the course thereof, each plaintiff engaged in misconduct for which Marsh would have terminated his employment, had it been aware of the misconduct at the time it occurred.

## SIXTH AFFIRMATIVE DEFENSE

71.    While employed by Marsh, each of the plaintiffs breached his duty of loyalty to Marsh, by, inter alia, disclosing to third parties confidential and proprietary information concerning Marsh's business, clients and prospective clients, and soliciting Marsh employees to terminate their employment with Marsh.  Each of the plaintiffs is not entitled to compensation during the period of his disloyalty, including without limitation the benefits he seeks in this action.

## COUNTERCLAIMS

Counterclaim-plaintiff Marsh USA Inc. ("Marsh" or the "Company"), by its attorneys, Winston & Strawn LLP, as and for its counterclaims against counterclaim-defendants Steven H. Anderson ("Anderson"), Jack S. Flug ("Flug") and Jeffrey R. Lattmann ("Lattmann") (collectively, "counterclaim-defendants"), hereby alleges as follows:

### Nature of the Action

72.    This is an action to recover damages from each of the counterclaim-defendants for breaches of covenants contained in his written non-solicitation and confidentiality agreements

7

with Marsh, as well as for breaches of his common law duty of loyalty to the Company, based on attempted and actual misappropriation of Marsh business, solicitation of Marsh clients, prospective clients and employees, wrongful disclosure of the Company's confidential and proprietary information, and tortious interference with the Company's prospective business relations. Each of the counterclaim-defendants was fully aware of his contractual and fiduciary obligations to Marsh; indeed, the counterclaim-defendants plotted ways of masking and concealing their faithless and disloyal conduct from Marsh, both among themselves and with their new employer.

### Jurisdiction and Venue

73.     Supplemental jurisdiction over the counterclaims is conferred on this Court by 28 U.S.C. § 1367, in that they are so related to the claims in the action that they form part of the same case or controversy.

74.     Venue herein is proper pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the counterclaim occurred in the City and State of New York.

### The Parties

75.     Marsh is a risk and insurance services firm with offices at 1166 Avenue of the Americas, New York, New York.

76.     Anderson is an attorney who was employed by Marsh as a senior executive in its FINPRO (Financial and Professional) Practice from in or about August 1989 through on or about December 30, 2004, when his employment was terminated by Marsh for cause. The FINPRO Practice provides financial and professional coverages to the Company's corporate clients, including director and officer liability insurance, employment practices liability insurance, professional liability insurance, fiduciary liability insurance and crime insurance. At the time of

the termination of his employment, Anderson was the National Head of Marsh's FINPRO Practice.

77.    In his role as National Head of FINPRO, Anderson had full access to confidential and proprietary information of Marsh, including without limitation information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, clients and personnel. As part of his duties and responsibilities, Anderson was entrusted with interacting, on the Company's behalf, with clients and prospective clients developed by and at the expense of the Company, as well as with supervising the solicitation and servicing activities relating to such clients, including without limitation El Paso Corporation ("El Paso"), Altria Group, Inc. ("Altria"), Verizon Communications ("Verizon") and Genworth Financial, Inc. ("Genworth"). In addition, Anderson was entrusted with managing and interacting with Marsh employees on the Company's behalf. As a result of and throughout his employment with Marsh, Anderson received substantial compensation and benefits from the Company.

78.    Flug is also an attorney, and was employed by Marsh as a Managing Director in its FINPRO Practice from in or about March 1995 through on or about December 30, 2004, when his employment was terminated by Marsh for cause. In that role, Flug had access to confidential and proprietary information of Marsh, including without limitation information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, clients and personnel. As part of his duties and responsibilities, Flug was entrusted with interacting, on the Company's behalf, with clients and prospective clients developed by and at the expense of the Company, as well as with supervising the solicitation and servicing activities relating to such clients, including without limitation Verizon. In addition, Flug was entrusted with managing and interacting with Marsh employees on the Company's behalf. As a result of and throughout his

employment with Marsh, Flug received substantial compensation and benefits from the Company.

79.    Lattmann commenced his employment with Marsh in or about March 1990, and served as Co-Head of U.S. FINPRO Placement from May 2003 through on or about December 30, 2004, when his employment was terminated by Marsh for cause.  In that role, Lattmann had access to confidential and proprietary information of Marsh, including without limitation information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, clients and personnel.  As part of his duties and responsibilities, Lattmann was entrusted with interacting, on the Company's behalf, with clients and prospective clients developed by and at the expense of the Company, as well as with supervising the solicitation and servicing activities relating to such clients, including without limitation Altria.  In addition, Lattmann was entrusted with managing and interacting with Marsh employees on the Company's behalf.  As a result of and throughout his employment with Marsh, Lattmann received substantial compensation and benefits from the Company.

<u>Statement of Facts</u>

80.    In or about December 2003, each of the counterclaim-defendants entered into a written agreement with Marsh entitled "Marsh USA Inc. Non-Solicitation Agreement for Participants in the Discretionary Bonus Plan" ("Non-Solicitation Agreement"), copies of which are annexed as Exhibits A, B and C, respectively.

81.    Under Paragraph 1(a) of the Non-Solicitation Agreement, each of the counterclaim-defendants agreed that, should his employment with Marsh be terminated for any reason, he would not, for a period of one year from the date of such termination, directly or indirectly,

> solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients . . . .

82.    Under Paragraph 1(b) of the Non-Solicitation Agreement, each of the counterclaim-defendants further agreed that he would not, for a period of one year from the date of termination of his Marsh employment, directly or indirectly,

> solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

83.    In or about December 2003, each of the counterclaim-defendants entered into a written agreement with Marsh entitled "Marsh USA Inc. Confidentiality and Ownership Rights Agreement" ("Confidentiality Agreement"), copies of which are annexed as Exhibits D, E and F, respectively.

84.    Under Paragraph 3 of the Confidentiality Agreement, captioned "Nondisclosure of Confidential Information," each of the counterclaim-defendants agreed that:

> During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company.   After termination of my employment with the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

11

85.    Paragraph 2 of the Confidentiality Agreement defines "Confidential Information" to include, inter alia, information concerning the Company, including without limitation its business, employees, finances and marketing practices, as well as information concerning any client or prospective client of the Company.

86.    In consideration for entering into the Non-Solicitation Agreement and the Confidentiality Agreement, each of the counterclaim-defendants received substantial consideration from Marsh.

87.    Beginning no later than November 2004, while they were still employed by Marsh, counterclaim-defendants conspired to misappropriate FINPRO business for their own benefit, and to solicit other FINPRO employees to leave the Company. As part of that scheme, counterclaim-defendants began actively soliciting employment offers from firms that were direct competitors of Marsh, and disclosed confidential and proprietary business information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, as well as information concerning FINPRO's clients, prospective clients and employees to such prospective employers. In addition, while they were still employed by Marsh, counterclaim-defendants actively solicited, induced and encouraged various other FINPRO employees, including without limitation John Kerns and Tom Zacharopoulos, to terminate their employment with the Company.

88.    In the course of implementing their scheme to pirate the FINPRO Practice, counterclaim-defendants, led by Anderson, engaged in extraordinary efforts to conceal their plan from Marsh, organizing and conducting clandestine off-site meetings during regular business hours, and plotting ways (among themselves, as well as with prospective employers) of masking

their violations of contractual and fiduciary obligations. The full extent of the counterclaim-defendants' faithless conduct is information peculiarly within their knowledge and control.

89.    Despite counterclaim-defendants' best efforts, however, in late December 2004, Marsh management became aware of at least some of counterclaim-defendants' faithless conduct. Accordingly, on or about December 30, 2004, Marsh terminated counterclaim-defendants' employment, for cause. As part of the exit process, Marsh Human Resources personnel reiterated to each of the counterclaim-defendants his continuing obligations to the Company under the Non-Solicitation Agreement and the Confidentiality Agreement.

90.    On or about January 3, 2005, each of the counterclaim-defendants commenced employment with Beecher Carlson, Inc. ("Beecher"), an insurance and brokerage firm in direct competition with Marsh.

91.    Upon joining Beecher, each of the counterclaim-defendants entered into an employment arrangement with Beecher that based his current and future compensation, in significant measure, on how much business he could bring into Beecher, and how quickly he could do so. To that end, within the first few months after departing Marsh, the counterclaim-defendants solicited business for Beecher from Marsh FINPRO clients, including without limitation El Paso, Altria, Verizon and Genworth. Indeed, beginning no later than in or about April 2005, Beecher commenced performing services for Marsh clients. The business solicited and accepted by each of the counterclaim-defendants for such clients was of a type that was offered by Marsh during the term of each of the counterclaim-defendants' employment with the Company, and that presently continues to be offered by Marsh.

92.    In addition, within the first few months after departing Marsh, each of the counterclaim-defendants continued to solicit Marsh FINPRO employees – including without

limitation, Andre O'Reggio, Tom Tierney, Eugene "Tripp" Sheehan and Louise Pennington – to terminate their employment with Marsh.

93.    Upon information and belief, after joining Beecher, each of the counterclaim-defendants, in derogation of his contractual and common law duties to Marsh, used confidential and proprietary information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, as well as information concerning FINPRO's clients, prospective clients and employees, to solicit the business of FINPRO clients and prospective clients, and to induce and encourage FINPRO employees to terminate their employment with Marsh.  The full extent of the counterclaim-defendants' wrongful conduct with respect to such activities is information peculiarly within their knowledge and control.

### FIRST COUNTERCLAIM
(Breach of Contract – Non-Solicitation Agreement)

94.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 93 above, as if fully set forth herein.

95.    The Non-Solicitation Agreement constitutes a valid, binding and enforceable contract between Marsh and each of the counterclaim-defendants.

96.    Marsh has duly performed all of its obligations under each of the Non-Solicitation Agreements.

97.    By reason of the acts described above, each of the counterclaim-defendants has breached his obligations to Marsh under his Non-Solicitation Agreement.

98.    As a result of each of the counterclaim-defendants' breaches of the Non-Solicitation Agreement, Marsh has suffered damages, in amounts to be proven.

## SECOND COUNTERCLAIM
(Breach of Contract – Confidentiality Agreement)

99.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 98 above, as if fully set forth herein.

100.    The Confidentiality Agreement constitutes a valid, binding and enforceable contract between Marsh and each of the counterclaim-defendants.

101.    Marsh has duly performed all of its obligations under each of the Confidentiality Agreements.

102.    By reason of the acts described above, each of the counterclaim-defendants has breached his obligations to Marsh under his Confidentiality Agreement.

103.    As a result of each of the counterclaim-defendants' breaches of the Confidentiality Agreement, Marsh has suffered damages, in amounts to be proven.

## THIRD COUNTERCLAIM
(Breach of Duty of Loyalty)

104.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 103 above, as if fully set forth herein.

105.    During the term of his employment with Marsh, each of the counterclaim-defendants was charged with a duty to act with undivided loyalty and with the utmost fidelity, honesty and good faith to the Company.

106.    Further, following the termination of his employment with Marsh, each of the counterclaim-defendants remained subject to a duty not to disclose or use any confidential and proprietary information of Marsh obtained during the course of his employment with Marsh, to the detriment of the Company.

107.    By reason of the acts described above, both while still employed by Marsh and thereafter, each of the counterclaim-defendants breached his duty of loyalty to the Company.

108.    As a result of each of the counterclaim-defendants' breaches of his duty of loyalty, Marsh has suffered damages, in amounts to be proven, and is entitled to punitive damages in such amounts as proof may warrant.

FOURTH COUNTERCLAIM
(Misappropriation of Confidential and Proprietary Information)

109.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 108 above, as if fully set forth herein.

110.    During the course of his employment with Marsh, each of the counterclaim-defendants had access to confidential and proprietary information of Marsh, including without limitation information concerning FINPRO's finances, pricing, profit margins, business and marketing strategies, clients and personnel.

111.    Both during the course of his employment with Marsh and thereafter, each of the counterclaim-defendants wrongfully appropriated for his own use and benefit, and disclosed to third parties, including Beecher, Marsh's confidential and proprietary information, for the purpose, inter alia, of soliciting Marsh's clients, prospective clients and employees.

112.    As a result of each of the counterclaim-defendants' misappropriation of Marsh's confidential and proprietary information, Marsh has suffered damages, in amounts to be proven, and is entitled to punitive damages in such amounts as proof may warrant.

FIFTH COUNTERCLAIM
(Tortious Interference with Prospective Business Relations)

113.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 112 above, as if fully set forth herein.

114. The counterclaim-defendants were aware of Marsh's prospective business relations with clients and prospective clients of the Company, including without limitation El Paso, Altria, Verizon and Genworth. The counterclaim-defendants intentionally and wrongfully interfered with such prospective business relations by soliciting and inducing such clients to divert ongoing and future business and opportunities from Marsh to Beecher.

115. The counterclaim-defendants used wrongful means, including without limitation misappropriating and using Marsh's confidential and proprietary information, to effect such interference.

116. As a result of each of the counterclaim-defendants' wrongful acts, Marsh lost prospective business from its clients and prospective clients, including without limitation including without limitation El Paso, Altria, Verizon and Genworth. But for the interference of the counterclaim-defendants, Marsh would have entered into new or additional contracts, or renewed existing contracts, with such clients.

117. As a result of each of the counterclaim-defendants' wrongful acts, Marsh has suffered damages, in amounts to be proven, and is entitled to punitive damages in such amounts as proof may warrant.

## SIXTH COUNTERCLAIM
### (Unfair Competition)

118. Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 117 above, as if fully set forth herein.

119. Each of the counterclaim-defendants, using Marsh's confidential and proprietary information, participated in a scheme to solicit Marsh's clients, prospective clients and employees for his own benefit and the benefit of Beecher, a direct competitor of Marsh.

17

120.    Each of the counterclaim-defendants' wrongful use of Marsh's confidential and proprietary information provided him with an unfair competitive advantage that he would not otherwise have enjoyed.

121.    As a result of each of the counterclaim-defendants' wrongful acts, Marsh has suffered damages, in amounts to be proven, and is entitled to punitive damages in such amounts as proof may warrant.

## SEVENTH COUNTERCLAIM
(Recoupment)

122.    Counterclaim-plaintiff repeats and realleges the allegations of paragraphs 72 through 121 above, as if fully set forth herein.

123.    During the course of his employment, each of the counterclaim-defendants breached his fiduciary obligations to Marsh, and, as a result thereof, forfeited his right to retain any and all compensation or other benefits received by him from Marsh during the period of his disloyalty.

124.    As a result of the foregoing, Marsh is entitled to recoupment from each of the counterclaim-defendants of such compensation and benefits received by him, in amounts to be proven.

*  *  *  *

125.    Counterclaim-plaintiff demands a trial by jury as to each of its claims.

WHEREFORE, MMC and Marsh demand judgment against each plaintiff and counterclaim-defendant as follows:

A.    Dismissing the amended complaint in its entirety, with prejudice and on the merits;

B.    On the First Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, plus attorneys' fees, statutory interest and costs;

C.    On the Second Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, plus attorneys' fees, statutory interest and costs;

D.    On the Third Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, as well as punitive damages in such amounts as proof may warrant, plus attorneys' fees, statutory interest and costs;

E.    On the Fourth Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, as well as punitive damages in such amounts as proof may warrant, plus attorneys' fees, statutory interest and costs;

F.    On the Fifth Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, as well as punitive damages in such amounts as proof may warrant, plus attorneys' fees, statutory interest and costs;

G.    On the Sixth Counterclaim, awarding counterclaim-plaintiff damages against each counterclaim-defendant in amounts to be proven, as well as punitive damages in such amounts as proof may warrant, plus attorneys' fees, statutory interest and costs;

H.    On the Seventh Counterclaim, awarding counterclaim-plaintiff recoupment of all compensation and benefits paid to each of the counterclaim-defendants during his period of disloyalty; and,

I.       Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
          July 30, 2008

                                   Respectfully Submitted,

                                   WINSTON & STRAWN LLP


                                   By: /s/ Stephen L. Sheinfeld          
                                        Stephen L. Sheinfeld
                                   200 Park Avenue
                                   New York, New York 10166
                                   (212) 294-6700
                                   (212) 294-4700 (facsimile)
                                   ssheinfeld@winston.com

                                   Attorneys for Defendant
                                   Marsh & McLennan Companies, Inc.
                                   and Defendant-Counterclaim-Plaintiff
                                   Marsh USA Inc.

NY:1192291.2

# EXHIBIT A

## Marsh USA Inc. Non-Solicitation Agreement
### for Participants in the Discretionary Bonus Plan

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.    <u>Non-Solicitation of Company Business and Employees</u>

I understand and acknowledge that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a)    solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for

(i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

(ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b)    solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

2.    <u>Miscellaneous</u>

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my work for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.    I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.      In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.      I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies.  Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.      I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to my business activities during and/or subsequent to my employment by the Company.

f.      I understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.      I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

This Agreement shall be construed in accordance with the laws of the State of New York.

Name (Print):  Steven H. Anderson          SS#: _____

Signature:  _Steven H. Anderson_    Date: _12_|_04_|_03_

# EXHIBIT B

### Marsh USA Inc. Non-Solicitation Agreement
### for Participants in the Discretionary Bonus Plan

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.  **Non-Solicitation of Company Business and Employees**

I understand and acknowledge that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for

(i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

(ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b) solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

2.  **Miscellaneous**

a. Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my work for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b. I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.      In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.      I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.      I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to my business activities during and/or subsequent to my employment by the Company.

f.      I understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.      I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

This Agreement shall be construed in accordance with the laws of the State of New York.

Name (Print):   JACK FLUG                      SS#: ████████████

Signature:   _____                   Date:  12/18/03

# EXHIBIT C

Marsh USA Inc. Non-Solicitation Agreement
for Participants in the Discretionary Bonus Plan

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.    Non-Solicitation of Company Business and Employees

I understand and acknowledge that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a)    solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for

(i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

(ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b)    solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

2.    Miscellaneous

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my work for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.    I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.    In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.    I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.    I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to my business activities during and/or subsequent to my employment by the Company.

f.    I understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.    I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

This Agreement shall be construed in accordance with the laws of the State of New York.

Name (Print):  _JEOFREY R. LAMANN_     SS#: ███████████

Signature:  _[signature]_      Date: _12/16/03_

# EXHIBIT D

# MARSH USA INC.

## Confidentiality and Ownership Rights Agreement

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.    Acknowledgment of Confidential Nature of Work

I understand and acknowledge that:

(i)    the nature of the Company's work is highly confidential;

(ii)   as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;

(iii)  providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and

(iv)   I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.

2.    Definition of "Confidential Information," "Inventions" and "Copyrightable Work"

a.    For the purposes of this Agreement, "Confidential Information" shall consist of and include:

(i)    any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;

(ii)   any and all information in whatever form relating to the Company, including but not limited to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and

other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business;

(iii)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party;

(iv)    Inventions (as defined below); and

(v)    Copyrightable Works (as defined below).

Information which otherwise falls within the definition of "Confidential Information" above shall not be considered Confidential Information to the extent that:

(A)    the information has been published or made generally available, or is otherwise in the public domain, without breach of this Agreement; or

(B)    the information was given to me by a party (other than a client or prospective client of the Company or another employee of the Company) who was not obligated to the Company or any of its clients or prospective clients to maintain its confidentiality.

b.    For the purposes of this Agreement, "Inventions" shall include, but not be limited to, all inventions, designs, specifications, insurance policy forms and provisions, instructions, formulations, products, discoveries, articles, reports, specimens, models (computer or otherwise), methods of analysis, prototypes, sketches, processes, methods, frameworks, formulas, systems, techniques, trademarks, names, commercial or business methods of any kind, concepts, and ideas, the expressions of all concepts and ideas, computer programs, codes, documentation, software, improvements, and all modifications and developments with respect to the foregoing and know-how related thereto, whether or not any such Invention is eligible for patent, trademark, copyright, trade secret or other legal protection.

c.    For the purposes of this Agreement, "Copyrightable Work" means any work subject to copyright protection as defined by the U.S. Copyright Act, 17 U.S.C. § 102 including, but not limited to, catalogs, directories, factual, reference or instructional works, literary and dramatic works, pictorial, musical and graphic works, motion pictures

and other audiovisual works, sound recordings, architectural works and compilations of data, computer data bases and computer programs.

3.    Nondisclosure of Confidential Information

During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment with the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

4.    Return of Materials Upon Termination of Employment

Upon the termination of my employment with the Company for any reason, I will leave at the Company or return to the Company within seven (7) days:

a.    any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information; and

b.    all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

I agree that, upon my completion of the obligations set forth in Section 4, paragraphs a. & b. above and my receipt of a request from the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information nor have I supplied the same to any person, except as required to carry out my  duties as an employee of the Company.  I understand that a receipt signed by a Managing Director of the Company (or his/her delegate) itemizing the returned property and materials shall be necessary to demonstrate that the property or materials itemized were so returned and the Company agrees not to unreasonably withhold production of such a receipt.

5.    Assignment of Rights to Inventions; Ownership of Copyrightable Works

a.    I hereby assign, and agree to assign, to the Company all my present and future right, title and interest in and to any Inventions conceived, discovered, reduced to practice and/or made by me during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement), such assignment to occur within 30 days of such conception, discovery, reduction to practice, or making, whichever is earlier (or, if prior to the date of this Agreement, within 30 days after the date hereof), whether such Inventions were conceived, discovered and/or reduced to practice and/or made by me solely or jointly with others, on or off the premises of the

Company's business, or during or after working hours, if such Invention(s): (i) were conceived, discovered, reduced to practice and/or made with the Company's facilities, equipment, supplies and/or trade secrets; or (ii) relate to the Company's current, potential or anticipated business activities, work or research; or (iii) result from work done or to be done by me or under my direction, alone or jointly, for the Company. I further acknowledge and agree that such Inventions as referred to herein belong to the Company and that the Company may keep such Inventions and/or processes pertaining thereto, whether patented or copyrighted or not, as trade secrets and make all decisions regarding whether and how to use such Inventions and/or processes. I further agree not to use or seek any commercial exploitation of or otherwise use any Invention required to be assigned under this Agreement for personal use.

b.      I acknowledge, agree, and intend that all Copyrightable Work I create during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement) and within the scope of my employment shall be considered to be "works made for hire" as defined under the U.S. Copyright Act, 17 U.S.C. §§ 101 et seq. I also acknowledge, agree, and intend that the Company will be deemed the author of all such works made for hire and the owner of all of the rights comprised in the copyright of such works.

c.      I agree to execute all documents and do all things deemed necessary by the Company at the Company's sole discretion to assist the Company in obtaining: (i) patent and/or trade secret protection in all countries for all Inventions referred to in Section 5, paragraph a; and (ii) copyright protection in all Copyrightable Work created by me during the period of time that I am employed by the Company. All acts required by this Section 5, paragraph c., will be at the Company's expense.

d.      I understand and agree that: (i) no license or conveyance of any rights or warranty to me is granted or implied by the Company furnishing or disclosing any Inventions or Copyrightable Works to me; and (ii) the Company shall retain whatever ownership and other proprietary rights it otherwise has in all Inventions and Copyrightable Works.

6.    Miscellaneous

a.      Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my treatment of Confidential Information or my work assignments for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.      I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.      In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.      I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies.  Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.      I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to confidentiality or my business activities during and/or subsequent to my employment by the Company.

f.      I understand that without executing this Agreement, I would not be eligible to participate in the Bonus Plan.  I also understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.      I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer.  Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

h.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed therein.

*Signed and agreed to by*:

_____          __12__/__04__/__03_____
EMPLOYEE (signature)                              TODAY'S DATE

Steven H. Anderson
EMPLOYEE (print name)

- 6 -

# EXHIBIT E

# MARSH USA INC.

## Confidentiality and Ownership Rights Agreement

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1. <u>Acknowledgment of Confidential Nature of Work</u>

    I understand and acknowledge that:

    (i)     the nature of the Company's work is highly confidential;

    (ii)    as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;

    (iii)   providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and

    (iv)    I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.

2. <u>Definition of "Confidential Information," "Inventions" and "Copyrightable Work"</u>

    a.      For the purposes of this Agreement, "Confidential Information" shall consist of and include:

    (i)     any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;

    (ii)    any and all information in whatever form relating to the Company, including but not limited to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and

other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business;

(iii)   any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party;

(iv)   Inventions (as defined below); and

(v)   Copyrightable Works (as defined below).

Information which otherwise falls within the definition of "Confidential Information" above shall not be considered Confidential Information to the extent that:

(A)   the information has been published or made generally available, or is otherwise in the public domain, without breach of this Agreement; or

(B)   the information was given to me by a party (other than a client or prospective client of the Company or another employee of the Company) who was not obligated to the Company or any of its clients or prospective clients to maintain its confidentiality.

b.   For the purposes of this Agreement, "Inventions" shall include, but not be limited to, all inventions, designs, specifications, insurance policy forms and provisions, instructions, formulations, products, discoveries, articles, reports, specimens, models (computer or otherwise), methods of analysis, prototypes, sketches, processes, methods, frameworks, formulas, systems, techniques, trademarks, names, commercial or business methods of any kind, concepts, and ideas, the expressions of all concepts and ideas, computer programs, codes, documentation, software, improvements, and all modifications and developments with respect to the foregoing and know-how related thereto, whether or not any such Invention is eligible for patent, trademark, copyright, trade secret or other legal protection.

c.   For the purposes of this Agreement, "Copyrightable Work" means any work subject to copyright protection as defined by the U.S. Copyright Act, 17 U.S.C. § 102 including, but not limited to, catalogs, directories, factual, reference or instructional works, literary and dramatic works, pictorial, musical and graphic works, motion pictures

and other audiovisual works, sound recordings, architectural works and compilations of data, computer data bases and computer programs.

3.    Nondisclosure of Confidential Information

During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment by the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

4.    Return of Materials Upon Termination of Employment

Upon the termination of my employment with the Company for any reason, I will leave at the Company or return to the Company within seven (7) days:

a.    any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information; and

b.    all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

I agree that, upon my completion of the obligations set forth in Section 4, paragraphs a. & b. above and my receipt of a request from the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information nor have I supplied the same to any person, except as required to carry out my duties as an employee of the Company. I understand that a receipt signed by a Managing Director of the Company (or his/her delegate) itemizing the returned property and materials shall be necessary to demonstrate that the property or materials itemized were so returned and the Company agrees not to unreasonably withhold production of such a receipt.

5.    Assignment of Rights to Inventions; Ownership of Copyrightable Works

a.    I hereby assign, and agree to assign, to the Company all my present and future right, title and interest in and to any Inventions conceived, discovered, reduced to practice and/or made by me during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement), such assignment to occur within 30 days of such conception, discovery, reduction to practice, or making, whichever is earlier (or, if prior to the date of this Agreement, within 30 days after the date hereof), whether such Inventions were conceived, discovered and/or reduced to practice and/or made by me solely or jointly with others, on or off the premises of the

Company's business, or during or after working hours, if such Invention(s): (i) were conceived, discovered, reduced to practice and/or made with the Company's facilities, equipment, supplies and/or trade secrets; or (ii) relate to the Company's current, potential or anticipated business activities, work or research; or (iii) result from work done or to be done by me or under my direction, alone or jointly, for the Company. I further acknowledge and agree that such Inventions as referred to herein belong to the Company and that the Company may keep such Inventions and/or processes pertaining thereto, whether patented or copyrighted or not, as trade secrets and make all decisions regarding whether and how to use such Inventions and/or processes. I further agree not to use or seek any commercial exploitation of or otherwise use any Invention required to be assigned under this Agreement for personal use.

b.    I acknowledge, agree, and intend that all Copyrightable Work I create during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement) and within the scope of my employment shall be considered to be "works made for hire" as defined under the U.S. Copyright Act, 17 U.S.C. §§ 101 et seq. I also acknowledge, agree, and intend that the Company will be deemed the author of all such works made for hire and the owner of all of the rights comprised in the copyright of such works.

c.    I agree to execute all documents and do all things deemed necessary by the Company at the Company's sole discretion to assist the Company in obtaining: (i) patent and/or trade secret protection in all countries for all Inventions referred to in Section 5, paragraph a; and (ii) copyright protection in all Copyrightable Work created by me during the period of time that I am employed by the Company. All acts required by this Section 5, paragraph c., will be at the Company's expense.

d.    I understand and agree that: (i) no license or conveyance of any rights or warranty to me is granted or implied by the Company furnishing or disclosing any Inventions or Copyrightable Works to me; and (ii) the Company shall retain whatever ownership and other proprietary rights it otherwise has in all Inventions and Copyrightable Works.

6.    Miscellaneous

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my treatment of Confidential Information or my work assignments for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.    I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.    In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.    I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.    I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to confidentiality or my business activities during and/or subsequent to my employment by the Company.

f.    I understand that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I also understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.    I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

h.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed therein.

*Signed and agreed to by:*

_____
EMPLOYEE (signature)

JACK FLUG
_____
EMPLOYEE (print name)

12/18/03
_____
TODAY'S DATE

- 6 -

# EXHIBIT F

# MARSH USA INC.

## Confidentiality and Ownership Rights Agreement

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.  Acknowledgment of Confidential Nature of Work

    I understand and acknowledge that:

    (i)    the nature of the Company's work is highly confidential;

    (ii)   as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;

    (iii)  providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and

    (iv)   I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.

2.  Definition of "Confidential Information," "Inventions" and "Copyrightable Work"

    a.    For the purposes of this Agreement, "Confidential Information" shall consist of and include:

    (i)    any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;

    (ii)   any and all information in whatever form relating to the Company, including but not limited to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and

other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business;

(iii)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party;

(iv)    Inventions (as defined below); and

(v)    Copyrightable Works (as defined below).

Information which otherwise falls within the definition of "Confidential Information" above shall not be considered Confidential Information to the extent that:

(A)    the information has been published or made generally available, or is otherwise in the public domain, without breach of this Agreement; or

(B)    the information was given to me by a party (other than a client or prospective client of the Company or another employee of the Company) who was not obligated to the Company or any of its clients or prospective clients to maintain its confidentiality.

b.    For the purposes of this Agreement, "Inventions" shall include, but not be limited to, all inventions, designs, specifications, insurance policy forms and provisions, instructions, formulations, products, discoveries, articles, reports, specimens, models (computer or otherwise), methods of analysis, prototypes, sketches, processes, methods, frameworks, formulas, systems, techniques, trademarks, names, commercial or business methods of any kind, concepts, and ideas, the expressions of all concepts and ideas, computer programs, codes, documentation, software, improvements, and all modifications and developments with respect to the foregoing and know-how related thereto, whether or not any such Invention is eligible for patent, trademark, copyright, trade secret or other legal protection.

c.    For the purposes of this Agreement, "Copyrightable Work" means any work subject to copyright protection as defined by the U.S. Copyright Act, 17 U.S.C. § 102 including, but not limited to, catalogs, directories, factual, reference or instructional works, literary and dramatic works, pictorial, musical and graphic works, motion pictures

- 2 -

and other audiovisual works, sound recordings, architectural works and compilations of data, computer data bases and computer programs.

3.    Nondisclosure of Confidential Information

During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment by the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

4.    Return of Materials Upon Termination of Employment

Upon the termination of my employment with the Company for any reason, I will leave at the Company or return to the Company within seven (7) days:

a.    any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information; and

b.    all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

I agree that, upon my completion of the obligations set forth in Section 4, paragraphs a. & b. above and my receipt of a request from the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information nor have I supplied the same to any person, except as required to carry out my duties as an employee of the Company. I understand that a receipt signed by a Managing Director of the Company (or his/her delegate) itemizing the returned property and materials shall be necessary to demonstrate that the property or materials itemized were so returned and the Company agrees not to unreasonably withhold production of such a receipt.

5.    Assignment of Rights to Inventions; Ownership of Copyrightable Works

a.    I hereby assign, and agree to assign, to the Company all my present and future right, title and interest in and to any Inventions conceived, discovered, reduced to practice and/or made by me during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement), such assignment to occur within 30 days of such conception, discovery, reduction to practice, or making, whichever is earlier (or, if prior to the date of this Agreement, within 30 days after the date hereof), whether such Inventions were conceived, discovered and/or reduced to practice and/or made by me solely or jointly with others, on or off the premises of the

- 3 -

Company's business, or during or after working hours, if such Invention(s): (i) were conceived, discovered, reduced to practice and/or made with the Company's facilities, equipment, supplies and/or trade secrets; or (ii) relate to the Company's current, potential or anticipated business activities, work or research; or (iii) result from work done or to be done by me or under my direction, alone or jointly, for the Company.   I further acknowledge and agree that such Inventions as referred to herein belong to the Company and that the Company may keep such Inventions and/or processes pertaining thereto, whether patented or copyrighted or not, as trade secrets and make all decisions regarding whether and how to use such Inventions and/or processes. I further agree not to use or seek any commercial exploitation of or otherwise use any Invention required to be assigned under this Agreement for personal use.

b.    I acknowledge, agree, and intend that all Copyrightable Work I create during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement) and within the scope of my employment shall be considered to be "works made for hire" as defined under the U.S. Copyright Act, 17 U.S.C. §§ 101 et seq. I also acknowledge, agree, and intend that the Company will be deemed the author of all such works made for hire and the owner of all of the rights comprised in the copyright of such works.

c.    I agree to execute all documents and do all things deemed necessary by the Company at the Company's sole discretion to assist the Company in obtaining: (i) patent and/or trade secret protection in all countries for all Inventions referred to in Section 5, paragraph a; and (ii) copyright protection in all Copyrightable Work created by me during the period of time that I am employed by the Company.  All acts required by this Section 5, paragraph c., will be at the Company's expense.

d.    I understand and agree that: (i) no license or conveyance of any rights or warranty to me is granted or implied by the Company furnishing or disclosing any Inventions or Copyrightable Works to me; and (ii) the Company shall retain whatever ownership and other proprietary rights it otherwise has in all Inventions and Copyrightable Works.

6.    <u>Miscellaneous</u>

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my treatment of Confidential Information or my work assignments for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement.  I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.      I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

c.      In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.      I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies.  Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.      I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to confidentiality or my business activities during and/or subsequent to my employment by the Company.

f.      I understand that without executing this Agreement, I would not be eligible to participate in the Bonus Plan.  I also understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.      I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

h.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed therein.

*Signed and agreed to by*:

_____
EMPLOYEE (signature)

_____
TODAY'S DATE

_____
EMPLOYEE (print name)

- 6 -